Radford COX, Sr. and Radford Cox, Jr. *v.* STATE of
Arkansas

CR 90-264                                    808 S.W.2d 306

Supreme Court of Arkansas
Opinion delivered April 22, 1991

*Tucker & Thrailkill*, by: *Patricia A. Page*, for appellants.

*Winston Bryant*, Att'y Gen., by: *Sandy Moll*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. The appellants, Radford Cox, Sr. and Radford Cox, Jr., were jointly tried and convicted of the capital murder of Freddie Harrison. Both were sentenced to life in prison without parole. Together, they assert five points, and numerous sub-points, on appeal. We hold there is no reversible error and affirm the judgment of conviction. Because one of the points of appeal involves the sufficiency of the evidence, and another involves the denial of a request for a severance, it is necessary that we discuss the facts in detail.

Appellants Radford Cox, Sr. and Radford Cox, Jr., commonly known as Big Rad and Little Rad, attended the Independence Day celebration at the Clear Creek Bridge near Mena on July 4, 1989. Late in the day Little Rad, an adult, was setting off fireworks, when Freddie Harrison, a war veteran, said the fireworks made him nervous. He asked Little Rad to stop setting them off. Little Rad refused, and Harrison started to shove him around. Big Rad said, "Stop it, if you all don't stop it, somebody's

gonna get hurt." Harrison knocked Little Rad to the ground. Big Rad reached into his nearby van, grabbed a .25 caliber pistol, and fired three to five shots at Harrison; hitting him in the chest and side. Harrison fell to the ground near a road.

Jonathan Cox, a bystander, went to Harrison and attempted to aid him, but Little Rad kicked him away. Harrison was still breathing at the time. Little Rad dragged Harrison from the road over into some brush about two car lengths away. He returned to the van and said, "It's not over with yet, we gotta finish it." Big Rad handed him the pistol. Little Rad then disappeared into the nearby brush where he left Harrison. A witness heard three more shots. Little Rad reappeared and gave the pistol back to Big Rad. Harrison's body was later found by the police. He had been shot six times. Three of the bullet wounds were in his chest and side, and three more, which had been fired from only a few inches away, were in his head, with one of them being between the left eye and the left ear, another being to the left forehead, and the third being above the right ear. Subsequently, four of the bullets were removed from Harrison's body, and a firearms tool marks examiner found all four bullets had been fired from Big Rad's pistol.

Big Rad subsequently told Jessie Hooks that, "If it got out, he would be the same way Freddie [Harrison] was." Joann Cox, another eyewitness, said Big Rad told her to "Keep my fucking mouth shut or I would get the same thing." He told eyewitness Carl Duramus, "If I knew what was good for me, I'd keep my mouth shut, that I didn't know nothing about nothing."

Joann Cox quoted Little Rad as saying, "He shot Freddie Harrison in the head. He did not say in the head. He just said he shot him to get him out of his misery."

About eight months later Big Rad, while in the Scott County jail, solicited Arnold Shores, another inmate, to kill the state's main witness, Carl Duramus.

■ We can quickly dispose of the appellants' first argument, which involves the sufficiency of the evidence. Both contend there was no substantial evidence of premeditation and deliberation. Those elements of the crime may be inferred from circumstances, such as the character of the weapon used, the manner in

which it was used, the nature, extent, and location of the wounds inflicted, the conduct of the accused and the like. *Hamilton* v. *State*, 262 Ark. 366, 556 S.W.2d 884 (1977). Further, premeditation and deliberation in the act of murder can be formulated in the assailant's mind in an instant. They do not have to exist in the mind of the assailant for an appreciable length of time, but must exist when the assailant commits the act. *Shipman* v. *State*, 252 Ark. 285, 478 S.W.2d 421 (1972).

■ Here, Big Rad got a gun out of his van and fired four or five shots at the victim. Three of the shots hit his torso. He fell, mortally wounded. Little Rad prevented a bystander from aiding the victim and said, "It's not over yet, we gotta finish it." Big Rad handed the pistol to Little Rad who then fired three more rounds into the victim's head. It is hard to imagine any stronger direct evidence of a deliberate intent to kill.

Little Rad separately argues there was no direct evidence that he shot the victim. That bare statement is correct, but it does not entitle him to a reversal because the circumstantial evidence of Little Rad's guilt is so strong that it is inconsistent with any hypothesis other than guilt.

■ In another sub-point, both appellants contend that there was insufficient evidence to show which one of them caused the victim's death. Arkansas law defines causation for the purpose of determining criminal liability as follows:

> Causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

Ark. Code Ann. § 5-2-205 (1987). Our law is well established that, where there are concurrent causes of death, conduct which hastens or contributes to a person's death is a cause of death. *Tackett* v. *State*, 298 Ark. 20, 766 S.W.2d 410 (1989); *McClung* v. *State*, 217 Ark. 291, 230 S.W.2d 34 (1950); *Rogers* v. *State*, 60 Ark. 76, 29 S.W. 894 (1894). *See also*, W.R. LaFave & A.W. Scott, 1 *Substantive Criminal Law*, § 3.12 (1986); R.M. Perkins & R.N. Boyce, *Criminal Law*, 783-4 (3d Ed. 1982).

■ In the case at bar, the medical examiner who performed the autopsy on the victim testified, "Mr. Harrison was shot six times and he died as a result of these six wounds, which entered the brain, internal organs and caused death of internal bleeding." The eyewitnesses to the murder described the manner in which the killing occurred. The medical examiner's testimony, coupled with that of the eyewitnesses', was sufficient to prove that the victim died as a result of internal bleeding from the shots fired by the appellants. Thus, there was substantial evidence they caused the death of their victim.

In another point, the appellants argue that the trial court erred by refusing to grant their motion for a severance. Again, we can quickly dispose of the argument. A.R.Cr.P. Rule 22.3(b)(1) provides:

> (b) The court, on application of the . . . defendant other than under subsection (a), shall grant a severance of defendants:

> (i) if before trial it is deemed necessary to protect a defendant's right to a speedy trial, or it is deemed appropriate to promote a fair determination of the guilt or innocence of one (1) or more defendants.

■ We have held that the above rule gives the trial court discretion to grant or deny a severance, and the trial court's ruling will not be disturbed on appeal absent an abuse of that discretion. *McDaniel & Gookin* v. *State*, 278 Ark. 631, 648 S.W.2d 57 (1983).

> The issue of severance is to be determined on a case by case basis, considering the totality of the circumstances, with the following factors favoring severance: (1) where defenses are antagonistic; (2) where it is difficult to segregate the evidence; (3) where there is a lack of substantial evidence implicating one defendant except for the accusation of the other defendant; (4) where one defendant could have deprived the other of all peremptory challenges; (5) where if one defendant chooses to testify the other is compelled to do so; (6) where one defendant has no prior criminal record and the other has; (7) where circumstantial evidence against one defendant appears

stronger than against the other.

*Id.* at 638, 648 S.W.2d at 60.

■ In the present case, the appellants contend that their defenses were antagonistic since it could not be determined which bullets caused the death of the victim. However, as previously pointed out, the shots fired by both defendants contributed to, and were the cause of, the victim's death. The appellants' defenses were not antagonistic in this respect.

■ They further contend that their defenses were antagonistic because they were father and son. However, this argument is not convincing and is not supported by authority. We need not address it further. *Dixon* v. *State*, 260 Ark. 857, 545 S.W.2d 606 (1977).

Each appellant argues that the evidence against the other was stronger than against him, and accordingly, a severance should have been granted. Big Rad argues that the evidence of Little Rad dragging Harrison and shooting him at point blank range prejudiced Big Rad, who may have only acted in the heat of the moment, after his son had been attacked. The argument ignores that evidence that shows that Big Rad fired several shots into the torso of the victim from a range of a few feet, and that he gave his pistol to his son after his son had said he wanted to "finish the job."

■ Little Rad contends the evidence against him was only circumstantial, and therefore, a severance should have been granted. Although circumstantial, the evidence against him is as strong as that against his father. There is no reasonable conclusion to be drawn from the evidence except that Little Rad fired the shots into Harrison's head. Additionally, the testimony of Joann Cox showed that Little Rad admitted shooting the victim. Under the totality of the circumstances in this case, the trial court did not abuse its discretion in refusing to grant appellants separate trials.

■ Appellants next argue that the trial court erred in admitting the testimony of Arnold Shores. They contend that, pursuant to A.R.Cr.P. Rule 17(a)(i), the prosecutor failed to disclose the name and address of Arnold Shores. We hold that while Shores might have secreted information, the prosecutor did not do so, and the trial court did not abuse its discretion in

allowing Shores to testify. The facts surrounding Shores and his testimony are as follows: About two months before the trial Shores and Big Rad were both in the Scott County jail. Shores, while only twenty-four years old, had spent a good part of his life in trouble. At his young age, he had prior convictions for theft, breaking and entering, aggravated robbery, criminal mischief, terroristic threatening and, at the time, was in jail awaiting trial on a drug charge, for being a felon in possession of a firearm, and for theft by receiving. He was jail-smart and sought to cooperate with the police in the hope of gaining a lesser sentence. About three weeks before the appellant's trial, Shores was giving a criminal investigator information about some thefts in Greenwood and Fort Smith as well as some burglaries in Logan County. While discussing those matters with the investigator, he mentioned something about Big Rad asking him to do something. Little Rad's attorney, who coincidentally represented Shores, perhaps suspected Shores might become a witness because, according to his argument, several weeks prior to trial, he asked Shores if he knew anything about the July 4 murder. Shores said no. The trial was set to begin on Tuesday, April 17.

On Friday, April 13, the police talked to Shores, and that evening the prosecutor notified appellants' attorneys that Shores was a potential witness. The prosecutor confirmed this by a letter delivered the next day, Saturday, April 14. On Monday, April 16, Little Rad's attorney asked the sheriff to call Shores to find out if he really was going to be a witness. Shores responded that he was not going to testify. On Tuesday, April 17, after voir dire had commenced, the investigator took a written statement which was immediately provided to appellants' attorneys. That statement, and Shores' subsequent testimony, were to the effect that two months earlier, while he and Big Rad were in jail together, Big Rad tried to hire him to "go to Carl Duramus' house and get him out, threaten his family, make him write a statement saying he did that murder. . . . He said to make him write a statement saying he done it and shoot him, make it look like suicide, wipe the gun down. He said make sure the gun couldn't be traced."

The prosecutor gave notice on April 13 that Shores was a potential witness. Until April 17, neither the prosecutor nor the police knew for certain that Shores was going to be a witness. It was not until then that he divulged the request to kill Carl

Duramus. If information had been secreted, it was done by Shores, and not the State. Appellants' counsel seemed to recognize this at trial because they then argued:

> MR. COX:  We anticipate they're going to call some folks, Judge, this Arnold Wayne Shores, for example, and we object to the calling of Arnold Wayne Shores for a number of reasons. Here's a copy of the statement. One of the reasons that we object to the calling of Arnold Wayne Shores, as we previously told the Court, we claim surprise, that *we were misled by Arnold Wayne* with regard to his knowledge of this, the fact that he made the statement some time last week to the Criminal Investigation Division, told Sheriff Hunt Monday, not in his presence, in a phone call, that he knew nothing about this matter, hadn't talked to anybody, hadn't given any statement. In fact, we were presented with a different statement Tuesday, the day the trial started, a little after lunch time, where he talked about a whole bunch of his alleged knowledge of this . . . . (Emphasis added.)

Further, the failure of appellants' counsel to interview Shores appears to have been the result of misunderstanding between counsel, the Sheriff, and Shores, rather than the result of any impropriety on the part of the prosecutor. As previously set out, after the prosecutor listed Shores as a potential witness, but before the trial had started, appellants' counsel asked the Sheriff to phone Shores and see if he really was going to testify. Shores' testimony concerning the event is as follows:

BY MR. COX, (con't.) [Appellants' attorney]:

Q.   Mr. Shores, do you recall a telephone call that you got from Sheriff Maurice Hunt on Monday of this week?

A.   Yes, I do.

Q.   And do you recall the substance of that telephone conversation?

A.   Yes.

Q.   Do you recall telling Sheriff Hunt you just didn't remember any, or didn't know anything about this at all?

A. I told him I wasn't out there, I didn't know nothing that went on out there.

Q. Did you tell him that you had talked to anybody about this or did you tell him you hadn't talked to anybody?

A. He called me on the phone, asked me if I was a witness in this case, I said not that I know of. I said I wasn't out there, I don't know what went on.

Q. Did you tell him that you had not talked to anybody about this case? Did he ask you?

A. He asked me if I had talked to anyone about being a witness and I said no.

Q. But, in fact, you'd talked to Bobby Walker [criminal investigator] about it.

A. Not about being a witness.

Q. Had you talked to him, Mr. Shores, about this case?

A. I mentioned it to him.

Q. Pardon?

A. I mentioned a few things they'd said to me to him.

Q. Thank you.

BY THE COURT: Any other questions.

MR. BULLOCK: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. BULLOCK [Prosecuting attorney]:

Q. Mr. Shores, did you mean by the statement to the Sheriff that you weren't out there at the scene when this occurred?

A. Yes.

Little Rad additionally asks for reversal of his conviction by arguing that Shores' testimony should have been excluded since it did not apply to him. The argument does not entitle Little

Rad to relief. The statement was admissible against Big Rad, but before allowing Shores to testify, the trial court, on its own motion, noted that the testimony might be prejudicial to Little Rad and agreed to give a limiting instruction. Later, at the conclusion of Shores' testimony, the trial court asked Little Rad's attorney if he wished to have the limiting instruction given, and he responded that he did not. Therefore, Little Rad is not entitled to separate relief.

Both appellants argue that Shores' testimony regarding Big Rad's solicitation of him is immaterial. However, evidence of Big Rad's attempt to eliminate the key witness against him is relevant as evidence of his guilt. In *Kellensworth* v. *State*, 276 Ark. 127, 633 S.W.2d 21 (1982), this court held that evidence of a party's attempt to fabricate evidence of innocence was admissible as an admission and as proof of guilt. In reaching this conclusion, we quoted Wigmore, *Evidence*, § 278 (Chadbourn Rev. 1979) as follows:

> that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates indefinitely though strongly, against the whole mass of alleged facts constituting his cause.

The appellants additionally argue that Shores' testimony should have been excluded because it was cumulative. The argument is without merit for two reasons: (1) the testimony was not cumulative and (2) the argument was not raised below.

Both appellants next argue that the trial court erred in allowing the testimony of Joann Cox and three other witnesses. We summarily dispose of the argument dealing with the three witnesses because no motion was made below with regard to them. Thus, we deal only with the testimony of Joann Cox. After she had testified a motion was made to strike her testimony because she supposedly had violated the rule. See A.R.E. Rule 615. The trial court heard proof on the issue and declined to strike

her testimony. The ruling was eminently correct. The sequestered witnesses did not discuss the facts of this case or what their testimony would be or had been. One merely returned to the witness room after testifying and said it was "rough."

At the time of sentencing, A.R.E. Rule 36.4 provided that a motion requesting a new trial on the grounds of ineffective assistance of counsel had to be filed within thirty days. Such a motion was filed, and a hearing was held. The trial court ruled that appellants were not entitled to a new trial. That ruling is included in this appeal.

Their first argument under this section is that appellants' attorneys were ineffective because they did not cross-examine five witnesses. The first of these was the medical examiner, Dr. Fahmy Malak. They contend he should have been asked which shot actually killed the victim. Such cross-examination would not have made any difference, and trial counsel obviously knew it. As previously discussed, the medical examiner's testimony established concurrent causes of death and it was not necessary to show which of the concurrent causes was the actual cause. Further, it would have been sheer madness for Little Rad's attorney to question whether three point-blank shots to the head were a cause of death, and in addition, Big Rad's attorney had previously found out that Dr. Malak, if questioned, would have testified that the wounds to the torso alone eventually would have been fatal.

Appellants argue their counsel were ineffective for not cross-examining a criminal investigator, the Polk County Sheriff, the Scott County Sheriff, and a Mena policeman. However, they presented no evidence on this issue at the hearing, and thus, have not overcome the strong presumption that counsel made all significant decisions in the exercise of reasonable professional judgment. *See Strickland* v. *Washington,* 466 U.S. 668 (1984).

The next ground alleged as ineffective assistance of counsel is the failure to present evidence of the appellants' intoxication during the guilt-innocence phase of the trial. The appellants argue the evidence of their intoxication at the time of the shooting would have tended to raise a reasonable doubt as to whether they had the requisite culpable mental state to commit capital murder. In *White* v. *State,* 290 Ark. 130, 717 S.W.2d 784

(1986), we held that voluntary intoxication is no longer a defense in criminal prosecutions. It is neither a statutory affirmative defense nor a common law defense negating intent in crimes requiring a "purposeful" mental state. *Pharo* v. *State*, 30 Ark. App. 94, 783 S.W.2d 64 (1990).

■ Further, appellants' attorneys did, in fact, elicit testimony from the witnesses about consumption of alcoholic beverages at the outing. The core of their argument seems to be that they should have been put on the witness stand. The argument is without any basis. At the hearing on the motion for a new trial, the trial attorneys testified that the appellants personally decided not to testify. Certainly Little Rad's counsel had good reason not to encourage him to testify since he had made a prior statement to authorities denying his presence at the scene of the shooting. This statement was not in evidence but could have been used to impeach him if he had testified. Likewise, Big Rad's counsel did not encourage him to testify about his intoxication because he felt it would not benefit him. Matters of trial tactics and strategy are not grounds for post-conviction relief. *Knappenberger* v. *State*, 283 Ark. 210, 672 S.W.2d 54 (1984).

■ Appellants also argue that their attorneys were ineffective because they failed to move for a mistrial after the prosecutor, in closing argument, referred to them as "killers" who needed to be taken out of society. Counsel objected to the language, and the trial court sustained the objection, but counsel did not move for a mistrial. Appellants contend that failure constituted ineffective assistance of counsel. Counsel's strategy was well taken, since a mistrial would not have been granted under such conditions. After all, the prosecutor's closing argument was based upon the evidence. It was not improperly inflamatory and would not mandate a mistrial.

Finally, because the sentences fixed in this case are life without parole, we are required by Rule 11(f) of the Rules of the Supreme Court and Court of Appeals to examine the record in order to determine whether there were any reversible rulings other than those argued. There are no such errors.

Affirmed.