Ratford COX, Sr., Petitioner

v.

Larry NORRIS, Director, Arkansas
Department of Corrections,
Respondent.

Civil No. PB–C–92–465.

United States District Court,
E.D. Arkansas.

Sept. 27, 1996.

Ratford Edward Cox, Pine Bluff, AR, pro se.

Jeffrey M. Rosenzweig, Little Rock, AR, for Petitioner.

Kelly K. Hill, Arkansas Attorney General's Office, Little Rock, AR, for Respondent.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

Before the Court is petitioner's amended petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. Respondent has filed a response to this petition, opposing the relief sought. For the reasons expressed in the following opinion, the Court will deny petitioner the habeas relief requested.

### I.

In April, 1990, petitioner and his son were tried jointly before a jury for the murder of Freddie Harrison. The basic factual background surrounding that murder has been summarized by the Arkansas Supreme Court.

[Petitioner] and [petitioner's son] ... attended the Independence Day celebration at the Clear Creek Bridge near Mena on July 4, 1989. Late in the day [petitioner's son], an adult, was setting off fireworks, when Freddie Harrison, a war veteran, said the fireworks made him nervous. He asked [petitioner's son] to stop setting them off [Petitioner's son] refused, and Harrison started to shove him around. [Petitioner] said, "Stop it, if you all don't stop it, somebody's gonna get hurt." Harrison knocked [petitioner's son] to the ground. [Petitioner] reached into his nearby van, grabbed a .25 caliber pistol, and fired three to five shots at Harrison; hitting him in the chest and side. Harrison fell to the ground near a road.

Jonathan Cox, a bystander, went to Harrison and attempted to aid him, but [petitioner's son] kicked him away. Harrison was still breathing at the time. [Petitioner's son] dragged Harrison from the road over into some brush about two car lengths away. He returned to the van and said, "It's not over with yet, we gotta finish it." [Petitioner] handed him the pistol [Petitioner's son] then disappeared into the nearby brush where he had left Harrison.

A witness heard three more shots. [Petitioner's son] reappeared and gave the pistol back to [petitioner]. Harrison's body was later found by the police. He had been shot six times. Three of the bullet wounds were in his chest and side, and three more, which had been fired from only a few inches away, were in his head, with one of them being between the left eye and the left ear, another being to the left forehead, and the third being above the right ear. Subsequently, four of the bullets were removed from Harrison's body, and a firearms tool marks examiner found all four bullets had been fired from [petitioner's] pistol.

[Petitioner] subsequently told Jessie Hooks that, "If it got out, he would be the same way Freddie [Harrison] was." Joann Cox, another eyewitness, said [petitioner] told her to "Keep my fucking mouth shut or I would get the same thing." He told eyewitness Carl Duramus, "If I knew what was good for me, I'd keep my mouth shut, that I didn't know nothing about nothing."

Joann Cox quoted [petitioner's son] as saying, "He shot Freddie Harrison in the head. He did not say in the head. He just said he shot him to get him out of his misery."

About eight months later [petitioner], while in the Scott County jail, solicited Arnold Shores, another inmate, to kill the state's main witness, Carl Duramus.

*Cox v. State*, 305 Ark. 244, 246–47, 808 S.W.2d 306, 308–09 (1991). The Court has independently examined the seven-volume transcript of petitioner's trial and is satisfied that the Arkansas Supreme Court's factual account is an accurate summary of the testimony and evidence presented at that trial. Accordingly, that court's factual findings are presumptively correct. 28 U.S.C. § 2254(d); *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir.1995); *Brown v. Lockhart*, 781 F.2d 654, 658 (8th Cir.1986); *Sumner v. Mata*, 449 U.S. 539, 546–47, 101 S.Ct. 764, 768–69, 66 L.Ed.2d 722 (1981).

On April 23, 1990, both petitioner and his son were convicted of capital murder, in violation of Ark.Code Ann. § 5–10–101(a) (Mi-

chie Supp.1989), and, although the death penalty was sought against each of them, the jury, in accordance with Ark.Code Ann. §§ 5–4–602 to –605 (Michie Supp. 1989), sentenced both to life imprisonment without possibility of parole. *See* Ark.Code Ann. § 5–10–101(c), sentenced both to life imprisonment without possibility of parole. See Ark. Code Ann. § 5–10–101(c) (Michie Supp.1989). On May 23, 1990, following his conviction but before his direct appeal, petitioner filed a motion for a new trial, challenging, among other issues (each of which had been raised at trial), the constitutional effectiveness of his court-appointed trial counsel, as he was then required to do under Ark R.Crim. P. 36.4 (Michie 1990).[1]  A hearing was held on this motion on August 13, 1990, at which petitioner was represented by his trial attorney, Mr. Wayland A Parker.  Following this hearing, the trial court indicated that it would deny petitioner's motion.  No order was entered to that effect, however.

Shortly thereafter, on August 30, 1990, the trial court, in light of the Arkansas Supreme Court's then-recent decision in *Mobbs v. State,* 303 Ark. 98, 792 S.W.2d 601 (1990), entered an order stating that it would reconsider petitioner's Rule 36.4 motion, insofar as petitioner had sought a new trial based upon ineffective assistance of trial counsel, and the trial court appointed a new attorney, Ms. Patricia Page, to represent petitioner in that Rule 36.4 proceeding.  On September 21, 1990, the trial court entered a similar order, in which it indicated that no final order had then been entered in connection with petitioner's Rule 36.4 motion, and the trial court scheduled a second hearing on petitioner's motion for October 5, 1990.  Following that hearing, which was completed on October 8,

1990, the trial court denied petitioner's Rule 36.4 motion in a written order filed on October 15, 1990.

On October 22, 1990, petitioner timely filed a notice of appeal with the Arkansas Supreme Court, *see* Ark. R.Crim. P. 36.9 (Michie 1990), and, on April 22, 1991, petitioner's conviction (as well as his son's) was affirmed on direct appeal *Cox v. State, supra.* No petition for certiorari was filed with the United States Supreme Court, and petitioner has not thereafter sought post-conviction relief under Ark. R.Crim. P. 37.1 (Michie 1991 to 1996).

On July 30, 1992, petitioner filed his initial *pro se* habeas petition, alleging, in essence, the same five grounds for relief he advanced on direct appeal before the Arkansas Supreme Court: [2]

(1) The trial court erred in not directing a verdict for petitioner in that the state failed to prove that petitioner acted with the requisite intent, *i.e.* with the "premeditated and deliberated purpose of causing the death of another," as required by Ark. Code Ann. § 5–10–101(a)(4) (Michie Supp. 1989).

(2) The trial court erred in permitting the testimony of Arnold Shores because Mr. Shores' testimony was not disclosed prior to trial and because his testimony was relevant and prejudicial.

(3) The trial court erred in not granting petitioner's severance motion in which he sought to be tried separately from his son.

(4) The trial court erred in admitting the testimony of Joann Cox, Jonathan Cox, James Roshto, and Carl Duramus because those witnesses had discussed their testi-

---

1.  During the period between July 1, 1989, and December 31, 1990, Arkansas abolished its rule-based post-conviction remedy (namely Ark R.Crim. P. 37).  See *In re Abolishment of Rule 37, etc.,* 299 Ark. 573, 770 S.W.2d 148 (1989) was under the version of Ark. R.Crim. P. 36.4 that was then in effect, which provided that such a challenge had to be made "within thirty (30) days from the pronouncement of sentence and entry of judgment." *See Robinson v. Norris,* 60 F.3d 457, 459 n. 2 (8th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1344, 134 L.Ed.2d 492(1996).  In other words, petitioner was a direct appeal from his underlying conviction

2.  The Court is not unaware of the time restrictions imposed by § 101 of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), P.L. 104–132, 104th Cong., 2d Sess. (signed into law on April 24, 1996).  Since retroactive effect (in contrast to § 107), the Court concludes that the provisions of the AEDPA do not apply retroactively to this § 2254 proceeding.  *Boria v. Keane,* 90 F.3d 36, 37–38 (2d Cir.1996); *see Warner v. United States,* 926 F.Supp. 1387, 1390 n. 4 (E.D.Ark.1996).

mony prior to trial, in violation of the trial court's order under Ark. R. Evid. 615.

(5) Petitioner's trial counsel was constitutionally ineffective because (a) he declined to cross-examine five key state witnesses; (b) he refused to allow petitioner to testify, and hence he failed to present evidence indicating petitioner's lack of the requisite intent; and (c) he failed to move for a mistrial based upon improper comments made during the prosecuting attorney's closing argument.

Petitioner was initially denied appointed counsel, and his petition languished before a magistrate judge for almost two years, due in large part to petitioner's failure to respond adequately to a prior order of the Court which had directed him to respond to certain procedural arguments raised by the respondent in his reply to petitioners initial petition, as well as his efforts to have a "jailhouse lawyer" file an amended and substituted "next friend" petition, ostensibly under the authority of 28 U.S.C. § 2242. The Court ultimately denied leave to file this "next friend" petition, but the Court, upon reconsideration of its prior orders, appointed counsel to represent petitioner and granted petitioner leave to file an amended petition.

On July 11, 1994, petitioner, through his appointed counsel, filed his amended habeas petition. Petitioner's amended petition raises, in addition to those arguments advanced in his initial petition (most of which have been incorporated by reference), several additional grounds for relief, most, but not all, of which were never presented to the state courts:

(1) Petitioner was denied effective assistance of counsel at trial because (a) trial counsel continued to represent petitioner even though he had a conflict of interest, namely the conflict caused by counsel's simultaneous representation of both petitioner and a key State's witness, Arnold Shores, and (b) trial counsel failed to argue for a mandatory severance of petitioner's trial from that of his son.

(2) Petitioner's due-process right to a fair trial was violated because (a) his trial counsel had a conflict of interest and (b) the trial court failed to sever petitioner's trial from that of his son.

(3) Petitioner was denied effective assistance of counsel during both his Rule 36.4 hearing and on direct appeal because (a) appellate counsel failed to raise petitioner's conflict-of-interest claim relating to his trial counsel during those proceedings and (b) appellant failed to raise petitioner's mandatory severance argument during those proceedings.

(4) The evidence presented at trial was insufficient to sustain petitioner's conviction for capital murder.[3]

The Court finds that all claims asserted by petitioner, except that claim described under (1)(a) above, are without merit, and they are, therefore, dismissed. The first four grounds for relief asserted in petitioner's initial, *pro se* petition fail to assert constitutional violations and, therefore, are not subject to vindication by a habeas court. The Court rejects petitioner's ineffective-assistance-of-counsel claims, except that *conflict-of-interest claim* asserted under (1)(a) above, on the ground that petitioner was represented, at all times, by individuals exercising professional judgment within the range of reasonableness described in *Strickland v. Washington,* and, even if some aspect of that behavior was unreasonable, the Court finds that any error made by counsel for petitioner did not prejudice petitioner under the *Strickland* standards. 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2065–66, 2068, 80 L.Ed.2d 674 (1984). Petitioner's claims that his trial should have been severed from his son's trial and that the testimony of Arnold Shores should have been excluded fail because petitioner's trial was not "fundamentally unfair." Finally, the Court finds that the evidence presented at trial was constitutionally adequate to support petitioner's conviction.

## II.

The Court is concerned with only those arguments that are related to the claim that

---

**3.** This is the only claim raised in petitioner's mended petition that was presented to the state courts. It was denied on the merits during his

direct appeal to the Arkansas Supreme Court. *Cox v. State, supra,* 305 Ark. at 247–49, 808 S.W.2d at 309–10.

a conflict of interest resulted from petitioner's trial counsel's simultaneous representation of both petitioner and one of the State's witnesses against him, Arnold Shores. On June 17, 1996, the Court held an evidentiary hearing on this issue and also heard arguments from the parties and afforded them the opportunity to file supplemental legal memoranda. After reviewing all of the parties' submissions and considering the evidence and legal arguments presented at the June 17 hearing, the Court is now prepared to role and is convinced that petitioner is not entitled to habeas relief on the above-described conflict-of-interest claim

The relevant facts surrounding Arnold Shores, petitioner, their relationship, and their respective legal representation are as follows. After petitioner had been arrested for the murder of Freddie Harrison, he was incarcerated in the Scott County Jail, where he met Arnold Shores. Mr. Shores was then in custody on unrelated charges of possession of methamphetamine, possession of drug paraphernalia, theft by receiving, and being a felon in possession of a firearm Trial Trans. at 807, 811–12. Mr. Shores testified that, while he was in the Scott County Jail, he was approached by petitioner, who asked Mr. Shores if, for a modest sum of money (about $2,000), he "would go to Carl Duramus' house and get him out, threaten his family, make him write a statement that he did th[e] murder [of Freddie Harrison] ... and [then] shoot him, mak[ing] it look like a suicide." Trial Trans. at 808. Apparently, petitioner wanted Mr. Duramus killed because he viewed him as "the key witness in the case." Trial Trans. at 818. This offer was twice made to Mr. Shores, who never gave petitioner a definite "yes or no" answer. Trial Trans. at 808.

About a month after this exchange, Mr. Shores informed the Arkansas investigative authorities that he had had a conversation with petitioner, but it does not appear that he told them the full details of that conversation (notably, the murder-for-hire aspect thereof). Trial Trans. at 808, 810. Mr.

Shores was later contacted by Arkansas investigative officials a few days before petitioner's trial, but again he declined to tell them about petitioner's offer. However, on April 17, 1991, the day petitioner's trial began, Mr. Shores gave the Arkansas authorities a written statement detailing petitioner's request that he kill Mr. Duramus. Trial Trans. at 809, 811. The admission of Mr. Shores' testimony was vigorously opposed by petitioner's trial counsel (primarily on the grounds of unfair surprise), but those objections were overruled and Mr Shores testified substantially in accord with his written statement. Mr. Shores also testified that he had not been promised any favorable treatment in connection with his then-pending criminal charges for his testimony against petitioner. Trial Trans. at 814–15. Finally, at the tail end of Mr. Shores' cross-examination by Mr. Parker, the following exchange took place:

[Mr. Parker] By the way, do you have an attorney that's presently representing you on the charges that you're now in jail on?

[Mr. Shores] Yes, I do. It's you.

[Mr. Parker] And did you talk to your attorney before you started talking to any police officers about the charges that may have been pending against you?

[Mr. Shores] I haven't seen you in two months.

Trial Trans. at 817. It also appears that Mr. Shores had, in the past, been represented by the attorney who represented petitioner's son at trial. Trial Trans. at 818.

Despite this revelation, neither the trial judge, the prosecutor, nor any other attorney commented or otherwise raised any objection about any possible, or actual, conflict of interest that may have resulted from Mr. Parker's simultaneous representation of petitioner and Mr. Shores. Furthermore, at the evidentiary hearing held on July 17, Mr. Parker confirmed not only that he was representing Mr. Shores at the time of petitioner's trial but also that he had represented Mr. Shores on numerous occasions in the past (including one a mere two months before petitioner's trial).[4]

---

4. During the June 17 hearing, Mr. Parker testified that, prior to Mr. Shores' revelation in open court, it simply had not dawned upon him that

Mr. Shores was also one of his past (and then present) clients. Also, the Court notes that it appears the judge who presided over petitioner's

## III.

Petitioner argues that, because of Mr. Parker's simultaneous representation of both petitioner and Mr. Shores, petitioner was denied his constitutional right to the effective assistance of counsel This claim is predicated upon the alleged conflict of interest that his trial counsel faced when he endeavored to represent simultaneously petitioner and a key witness for the State. This conflict-of-interest claim, however, has never been directly presented to the Arkansas state courts (nor were the various other conflict-based claims raised in his amended petition). Thus, the initial question that must be resolved is whether a procedural hurdle exists that now prevents the Court from reaching the merits of this claim

## A.

The first issue that must be addressed is exhaustion. In a nutshell, the exhaustion doctrine, now codified by 28 U.S.C. § 2254(b); *see also Ex parte Royall,* 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), requires a habeas petitioner first to present his claims to the state courts before seeking federal habeas relief *See Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981) (per curiam). Furthermore, the Supreme Court has embraced a rule of "total exhaustion," which means that every claim in a federal habeas petition must have first been presented to the state courts. *See Rose v. Lundy,* 455 U.S. 509, 519–20, 102 S.Ct. 1198, 1203–04, 71 L.Ed.2d 379 (1982). While petitioner has not exhausted his conflict-of-interest-based ineffective-assistance-of-trial-counsel claim (among others), respondent nevertheless concedes that all claims raised in this habeas petition satisfy the exhaustion requirement, as there is presently no available means for petitioner to have the merits of these claims decided by the Arkansas courts. *See* 28 U.S.C. § 2254(c). The Court accepts the state's waiver [5] and elects to overlook any exhaustion that may be posed by this petition. *See Granberry v. Greer, supra,* 481 U.S. 129, 135, 107 S.Ct. 1671, 1675–76, 95 L.Ed.2d 119 (1987); *Thompson v. Missouri Bd. of Parole,* 929 F.2d 396, 398 (8th Cir.1991).

## B.

While conceding that petitioner's conflict-of-interest claims have met § 2254's exhaustion requirement, respondent argues that the Court should decline to address the merits of these claims because they have been procedurally defaulted. Respondent is, of course, correct in recognizing that questions of exhaustion and procedural default raise distinct legal issues and, therefore, require separate analysis. *See generally Snell v. Lockhart,* 14 F.3d 1289, 1296–97 (8th Cir.1994); *Dickens v. Armontrout,* 944 F.2d 461, 462 n. 1 (8th Cir.1991). "If a petitioner fails to exhaust state remedies and the court to which he should have presented his claim would now find it procedurally barred, there is a procedural default." *Sloan v. Delo,* 54 F.3d 1371, 1381 (8th Cir.1995) (citing *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 2557 n. 1, 115 L.Ed.2d 640 (1991)), *cert, denied,* —— U.S. ——, 116 S.Ct. 728, 133 L.Ed.2d 679 (1996). The Court is convinced that the Arkansas courts would view petitioner's non-exhausted claims as procedurally defaulted because he is now time-barred (or otherwise precluded) from pursuing these claims in any post-conviction proceeding. Thus, while the Court is not precluded from examining the merits of these claims on exhaustion grounds (given the present unavailability of any such state remedies), the Court is faced with an obvious procedural default of

---

trial, and who appointed Mr. Parker to represent petitioner, *see* Petitioner's June 17, 1996 Hearing Exh. No. 9, also appointed Mr. Parker to represent Mr. Shores on his then pending charges, *see* Petitioner's June 17, 1996 Hearing Exh. Nos. 1–2, 6, as he had apparently done so in the past. *See* Petitioner's June 17, 1996 Hearing Exh. Nos. 3, 5.

**5.** Since the exhaustion doctrine is not jurisdictional, *Castille v. Peoples,* 489 U.S. 346, 349, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989), respondent can waive any benefit of the exhaustion defense. *See Granberry v. Greer,* 481 U.S. 129, 134–35, 107 S.Ct. 1671, 1675–76, 95 L.Ed.2d 119 (1987); *Pittman v. Gaines,* 905 F.2d 199, 200 n. 2 (8th Cir.1990). By not arguing the exhaustion issue, respondent has, in fact, done so. *See Fruit v. Norris,* 905 F.2d 1147, 1148 n. 3 (8th Cir. 1990).

these claims. As such, the Court may consider the merits of petitioner's defaulted claims (including his conflict-of-interest-based claims) only if he can demonstrate "cause" for the default and "prejudice" resulting therefrom.[6] *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); *Abdullah v. Groose,* 75 F.3d 408, 412–13 (8th Cir.) (en banc), *cert denied,* —— U.S. ——, 116 S.Ct. 1838, 134 L.Ed.2d 941 (1996); *Heffernan v. Norris,* 48 F.3d 331, 333 (8th Cir.1995).

■■■ Respondent argues that this conflict-of-interest claim has been procedurally defaulted due to petitioner's failure to raise it in the Arkansas courts. To the extent respondent's procedural-default argument is predicated upon petitioner's failure to raise this claim in a Rule 37 petition, this argument is foreclosed by the Eighth Circuit's decision in *Pearson v. Norris,* 52 F.3d 740 (8th Cir.1995). As has already been discussed, petitioner was convicted while the prior version of Rule 36.4 was in effect, but his conviction was affirmed in April, 1991, less than five months after the re-adoption of Rule 37. Under these circumstances, petitioner's failure to raise this conflict claim in a Rule 37 petition after the affirmance of his conviction does not trigger the procedural-default doctrine, even though he could have, in fact, sought such relief in the Arkansas courts. This is because in 1991, the availability of that remedy was not firmly established. *Id.* at 742. Moreover, under *Pearson,* petitioner's failure to raise this issue in his Rule 36.4 hearing, and then on direct appeal, is likewise, under these facts, insufficient to trigger the procedural-default doctrine. *See id.* at 741–42. As petitioner is now time-barred from pursuing such relief in the state courts, Pearson directs the Court to consider this claim on the merits. *Id.* at 742–43.

## IV.

The Court now turns to the merits of petitioner's ineffective-assistance-of-counsel claim that is predicated upon his trial counsel's alleged conflict of interest. There is, of course, no doubt that the Sixth Amendment's right to counsel embraces the right to the effective assistance of counsel, *Strickland v. Washington, supra,* which in turn encompasses the right to conflict-free counsel. *United States v. Acty,* 77 F.3d 1054, 1056 (8th Cir.1996); *Smith v. Lockhart,* 923 F.2d 1314, 1320 (8th Cir.1991). In this case, despite the defendant's failure to raise the issue, the trial court was presented with sufficient facts to put it on notice that a possible conflict of interest existed but then failed to make any inquiry to determine whether this possible conflict was, in fact, an actual conflict.[7] While a trial court is under no duty to inquire into potential conflicts of which it has no knowledge, *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 1717–18, 64 L.Ed.2d 333 (1980), it must conduct such an inquiry when it is (or should be) on notice of a possible conflict. *Wood v. Georgia,* 450 U.S. 261, 272, 101 S.Ct. 1097, 1103–04, 67 L.Ed.2d 220(1981); *see Cuyler v. Sullivan, supra,* 446 U.S. at 347, 100 S.Ct. at 1717–18. Under those circumstances, the Supreme Court has commented (but has *not held* ) that "[*Cuyler* *v.] Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood v. Georgia, supra,* 450 U.S. at 272 n. 18, 101 S.Ct. at 1104 n. 18 (quoting *Cuyler v. Sullivan, supra,* 446 U.S. at 347, 100 S.Ct. at 1717–18).

Some courts have interpreted *Wood* to stand for the proposition that, if a petitioner can show that the trial judge had notice (either actual or constructive) that his trial counsel suffered from a *possible* conflict of

---

**6.** Petitioner does not argue that he qualifies for the "actual innocence" or the "fundamental miscarriage of justice" exception to this cause–and–prejudice test. *See Schlup v. Delo,* 513 U.S. 298, ——–——, 115 S.Ct. 851, 863–65, 130 L.Ed.2d 808 (1995).

**7.** The Court assumes that when Mr. Shores indicated in open court that he was being represented by petitioners counsel—and thereby alerted

the trial judge to the fact that Mr. Parker was simultaneously representing Mr. Shores and petitioner—the trial judge was duty-bound to inquire into this possible conflict of interest, even absent an an actual conflict was remote. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). The record in the instant case indicates that no actual conflict existed.

interest (as opposed to an actual conflict of interest), *id.* at 272, 101 S.Ct. at 1103–04, and that the trial judge filed to inquire into this possible conflict, then the petitioner is entitled to an automatic reversal of his conviction. *See United States v. Levy,* 25 F.3d 146, 154 (2d Cir.1994) (citing cases); *see also* 2 Wayne R. Lafave & Jerold H. Israel, *Criminal Procedure* § 11.9(b) at 86 (1984). The Eighth Circuit has commented that when a trial court "fails to make an investigation into the source of a conflict ... when the court knows or reasonably should know that a conflict exists, reversal is automatic." *Dawan v. Lockhart,* 31 F.3d 718, 721 (8th Cir. 1994) (citing *Wood* ). Having made that comment, however, the Eighth Circuit declined to decide whether an automatic reversal is required in cases such as this, since it concluded that the petitioner in *Dawan* had met the *Cuyler* standard for relief. *Id.* ("Because we now hold that *Dawan* has demonstrated actual conflict and an adverse effect in his representation ... we see no need to determine whether automatic reversal is necessary under a 'knew or should have known' theory.").

■ This Court, however, cannot avoid the issue, because, after considering the evidence presented at the June 17 hearing (as well as that in the record), the Court has concluded that petitioner cannot meet the *Cuyler* standard. Thus, the Court must decide whether *Wood* entitles petitioner to an automatic reversal of his conviction for the trial judge's failure to investigate a potential conflict. This Court agrees with and, therefore, adopts the interpretation of *Wood* offered by the U.S. Court of Appeals for the First Circuit. In *O'Brien v. United States,* the First Circuit rejected a reading of *Wood* that would require reversal in every instance that a potential conflict appeared and went uninvestigated by the trial court. 695 F.2d 10, 15 n. 10 (1st Cir.1982). As the *Brien* court noted, "[t]he Court in *Wood* did *not* require

an automatic reversal of the conviction but merely remanded the case to enable the trial court to conduct the necessary inquiry, the implication being that the convictions would only be overturned if an actual conflict were found." *Id.* (emphasis added). "The mere possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler,* 446 U.S. at 350, 100 S.Ct. at 1719. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350, 100 S.Ct. at 1719. The *O'Brien* court allowed a section 2255 hearing to serve the same function as the remand in *Wood* and asked whether an *actual* conflict of interest existed. *See O'Brien,* 695 F.2d at 15 n. 10. Likewise, the Court will let its evidentiary hearing of July 17 serve that function and will ask whether there was an actual conflict of interest, as opposed merely to a potential conflict.

■ Precedent recognizes the distinction between potential and actual conflicts in cases similar to the instant case.[8] In *Burger v. Kemp,* the Supreme Court considered a case in which a habeas petitioner's conflict-of-interest claim centered on the fact that a defendant in a separate trial for the same crime was represented by petitioner's lawyer's law partner. 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). The Court concluded that no actual conflict of interest existed, finding that "the overlap of counsel, if any, did not so infect [the petitioner's] representation as to constitute an active representation of competing interests." *Id.* at 783, 107 S.Ct. at 3120. It is clear that such representation is pregnant with possible conflicts, but the Supreme Court found no actual conflict. The Court, moreover, was careful to distinguish this finding from a finding of no adverse effect, indicating that the Court was not collapsing actual conflict and adverse effect into one determination. Thus, *Kemp*

---

**8.** The term "actual conflict," as used here, refers only to the showing that must be made under the first prong of *Cuyler,* namely that counsel has actually represented conflicting interests. An actual conflict does not require a showing of an adverse effect on the attorney's representation, as is required under the second prong of *Cuyler.* There can be situations where an actual conflict

exists that does not result in an adverse effect of the attorney's representation. *See Burger v. Kemp,* 483 U.S. 776, 785, 107 S.Ct. 3114, 3121, 97 L.Ed.2d 638 (1987); *Dawan,* 31 F.3d at 721–22. Likewise, there are situations where a potential conflict does not become actual in that the asserted interests never diverge.

shows that a situation may pose problems of potential conflict that never spawn problems of actual conflict. For an actual conflict to emerge, the threat of adverse effect—even if no such effect materialized—must exist. The asserted interests must "diverge with respect to a material factual or legal issue or to a course of action." *Cuyler*, 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3.

█ Such a divergence of interests never occurred during Mr. Parker's simultaneous representation of petitioner and Mr. Shores. The Court finds, therefore, that no actual conflict existed in Mr. Parker's simultaneous representation of petitioner and Mr. Shores and rejects petitioner's habeas claim The Court recognizes that petitioner's argument that he has shown an actual conflict of interest is strong, but the Court finds that whatever potential conflict existed never matured into an actual conflict. Mr. Parker testified at the June 17 hearing that the issue of his potentially conflicting interests did not occur to him until sometime after petitioner's trial, and the Court credits this testimony. Indeed, had Mr. Parker detected an actual conflict, he probably would have made that conflict apparent to the trial court. *See Cuyler*, 446 U.S. at 347, 100 S.Ct. at 1716–18 (noting that, in light of counsel's ethical obligations, "trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist"). Thus, the Court concludes that this consideration did not impact upon Mr. Parker's representation of petitioner.

During the June 17 evidentiary hearing, Mr. Parker testified that, after being reminded at trial that he was then simultaneously representing petitioner and Mr. Shores, he thought, on hindsight, that he should have withdrawn from petitioner's case because, since he felt that Mr. Shores had lied on the stand and since he had personal knowledge through his interviews with Mr. Shores to back up that feeling, he *could* have been called as a rebuttal witness to discredit Mr. Shores' testimony. The Court acknowledges that this arrangement could not have been effected without Mr. Parker's violating his obligations to at least one of his clients. It is

essential to the Court's resolution of this case, however, that this arrangement never came to be. The *potential* for conflict is apparent. Had Mr. Parker taken the stand or even considered taking the stand-to rebut the testimony of Mr. Shores, an *actual* conflict would have emerged. (Even then, though, an examination of the results of Mr. Parker's testimony would be necessary to determine whether any party suffered an adverse effect of the actual conflict of interest.) Mr. Parker, however, did not even consider his simultaneous representation and the potential conflicts it posed until after petitioner's trial Thus, it is impossible that any actual conflict posed a threat of adverse effect to petitioner. Petitioner's and Mr. Shores' interests never reached the point where their divergence created an actual conflict of interest in Mr. Parker. Any such conflict lay dormant and, even now, since petitioner's trial is over, matters only in the realm of hypotheticals.

The instant case, moreover, is signally different from most conflict-of-interest cases. The paradigm situation presents joint representation of codefendants, and, indeed, most of the cases cited to the Court conform to that pattern. Joint representation of codefendants poses clear conflicts problems in that often codefendants assert inconsonant stories as each defendant attempts to cast blame on the other and to distance himself from the crime. Even then, though, "[r]equiring or permitting a single attorney to represent codefendants ... is not *per se* violative of constitutional guarantees of effective assistance of counsel" *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978). The facts of the instant case pose no such immediate dangers. Mr. Parker represented Mr. Shores on a matter wholly unrelated to his representation of petitioner, and there is no indication that Mr. Parker failed to "pursue [petitioner's] interests single-mindedly." *Wood*, 450 U.S. at 271–72, 101 S.Ct. at 1103. The Court finds, therefore, that any conflict of interests remained potential, never maturing to an actual conflict and that petitioner is not entitled to habeas relief based on Mr. Parker's simultaneous representation of petitioner and Arnold Shores.

## V.

IT IS THEREFORE ORDERED that petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 be, and it is hereby, DENIED.

### *JUDGMENT*

Pursuant to this Court's Memorandum Opinion and Order filed on this date, it is ORDERED petitioner's this petition for a writ of habeas corpus be, and it is hereby, DENIED.