Walter MICKENS, Jr., Petitioner,

v.

Fred W. GREENE, Warden,
Respondent.

No. Civ.A. 3:98cv102.

United States District Court,
E.D. Virginia,
Richmond Division.

Nov. 5, 1999.

Robert E. Lee, Jr., Richmond, VA, Robert J. Wagner, Wagner & Wagner, Richmond, VA, for plaintiff.

Robert Q. Harris, Office of the Attorney General, Richmond, VA, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Pursuant to 28 U.S.C. § 2254, Walter Mickens, a Virginia state prisoner, under sentence of death, filed a petition for a writ of habeas corpus challenging his conviction in the Circuit Court for the City of Newport News for capital murder. The Respondent has moved to dismiss the petition. After conducting an evidentiary hearing on one issue, the Court ordered further briefing. The action is ripe for disposition. Jurisdiction exists pursuant to 28 U.S.C. § 2254.[1]

## I. SUMMARY OF THE RECORD

On June 3, 1993, a jury, sitting in the Circuit Court for the City of Newport News, found Mickens guilty of the capital murder of Timothy Jason Hall in the commission of, or subsequent to the commission of, attempted forcible sodomy. On June 7, 1993, the jury concluded that Mickens would pose a future danger to society and that the murder was outrageously and wantonly vile and thereupon fixed Mickens' punishment at death. Mickens appealed his conviction and sentence to the Supreme Court of Virginia.

Upon review of the evidence, conducted in the light most favorable to the Commonwealth, the Supreme Court of Virginia found the following:

On March 28, 1992, Timothy Jason Hall, age 17, resided with 14–year–old Raheem Gordon and Gordon's father in an apartment located at 28th and Washington Streets in the City of Newport News. Hall and Gordon were roommates, and they often exchanged clothes, including shoes.

That day, between 7:00 and 8:00 p.m., Hall gave Gordon a ride, in Hall's auto-

mobile, to a party at the nearby Towers apartment building. At the time, Hall was wearing a pair of Gordon's Nike brand "Cross Trainer" tennis shoes. He also was wearing blue jeans and a shirt imprinted with either the word, "Duke," or the words, "Miami Hurricanes." Hall had intended to return to the party, but he never did. Neither Gordon nor his father ever saw Hall after that evening.

Vincent West and Bruce Mitchell also attended the party. About 8:00 p.m., they left the party and went to a nearby convenience store. After purchasing a few items and leaving the store, they sat in a park adjacent to the Towers apartment building. While sitting there, West and Mitchell saw a man with a bicycle, hiding in some bushes and looking at them. The man later was identified as the defendant, Mickens.

The following day, Gordon saw Hall's automobile. It was parked on West Avenue, near 28th Street, close to the Towers apartment building and in the same place it had been parked the previous night.

On March 30, 1992, about 12:30 p.m., Chris Basford was walking along the James River between 25th and 30th Streets when he saw a body beneath an abandoned construction company building. The body of a male Caucasian was lying face down on a mattress under a sheet of plywood. The body was nude from the waist down, except for white athletic socks, and its legs were spread apart approximately 12 inches. The victim was identified as Timothy Jason Hall.

Pubic hairs were recovered from the victim's buttocks. Bloody "transfer" stains were evident on the outsides of the victim's thighs, and a white liquid substance was observed close to the vic-

1. Because Mickens filed his petition for a writ of habeas corpus after the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") on April 24, 1996, review of the petition is governed by the deferential standards of § 28 U.S.C. § 2254(d), as

amended by the AEDPA. *See Mueller v. Angelone,* 181 F.3d 557, 570 (4th Cir.1999); *Green v. French,* 143 F.3d 865, 868 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 698, (1999).

tim's anus. Cigarette butts lying near the mattress also were recovered, and the mattress cover was seized for scientific examination. Nearby, the police found a pair of men's blue jeans and white underwear shorts that had washed up in the surf of the river. Gordon identified the clothes as those worn by Hall on the evening of March 28, 1992.

An autopsy revealed 143 separate "sharp force injuries" to the victim's body. Of the injuries, 62 were paired stab injuries that could have been caused by a multiple-blade knife, 13 were single stab wounds, and three were paired incised wounds.

The medical examiner who performed the autopsy concluded that the victim had bled to death and that 25 of the 143 wounds were fatal. The fatal wounds included four pairs of stab wounds that punctured the right lung, three single stab wounds that punctured the left lung, seven stab wounds to the skull that penetrated the brain, a stab wound to the forehead that also penetrated the brain, one pair of stab wounds that perforated the liver, and a pair of stab wounds to the right neck that severed the carotid artery and the jugular vein.

The medical examiner opined that the fatal wounds may not have caused instant death. Instead, she estimated that the victim could have lived as long as 30 to 40 minutes after infliction of the last wound and that, during this time, the victim may have been conscious.

On the evening of April 4, 1992, the police were informed that a black male, wearing a blue and white jacket and riding a bicycle, had assaulted a juvenile. Responding to this information, Police Officer D.A. Seals and Detective Dallas Mitchell found Mickens riding a bicycle in the parking area of the abandoned construction company building.

Seals exited the police car, displayed his badge, and approached Mickens. Mickens, thereupon, fled on his bicycle. Shortly thereafter, Seals and Mitchell again came upon Mickens as he was being detained by other police officers. Mickens was arrested at 7:00 p.m. on the charges involving the juvenile.

Mickens agreed to talk with the police after being advised of his Miranda rights. Officer Mitchell told Mickens that he knew Mickens had killed Hall, but the officer did not tell Mickens how Hall had been murdered. In denying involvement in Hall's murder, Mickens said, "You didn't find any knife on me; did you?"

The following morning, warrants were obtained charging Mickens with Hall's murder and attempted sodomy. When Officer Seals handed Mickens copies of the warrants, Mickens said, "I accept the warrants, I accept the charges." Seals asked Mickens what was meant by that statement, and Mickens responded, "Mother f__r, if I told you I accept the warrants that means I'm guilty, don't it?"

On April 7, 1992, the police found Michael Jacobs wearing the Nike brand "Cross Trainer" tennis shoes that Hall had been wearing when Gordon had last seen Hall alive. Jacobs told the police that he had bought the shoes from Mickens for $5.00 the previous week.

An examination of the pubic hairs removed from Hall's buttocks revealed that they were from an African–American and were alike in "all identifiable microscopic characteristics" to the pubic hair sample taken from Mickens. The expert who examined the hairs further testified that the hairs could not have originated from Hall because he was a Caucasian. The witness also stated that tissue was attached at the roots of the hairs, indicating the hairs had been forcibly removed, possibly by the rubbing of the genitals against Hall's buttocks.

An examination of a stain found on the mattress cover revealed human sperm. Through DNA analysis (RFLP type) [footnote omitted] of the sperm and of blood samples taken from Hall

and Mickens, the expert determined that Hall could not have produced the stain. The expert determined further that Mickens' DNA pattern matched the DNA pattern in the stain on the mattress cover. The witness also stated that the approximate percentages of the population that could have deposited the stain was one in 27,000 Caucasians, one in 6,000 African–Americans, and one in 2,000 Hispanics.

The cigarette butts and certain other hairs recovered at the crime scene also were subjected to DNA analysis (PCR type). [footnote omitted] Both Hall and Mickens had D.Q. Alpha type 1.2, 4. The expert making the comparisons determined that Mickens could not be eliminated as the source of the hairs and of the saliva on the cigarette butts. Mickens smoked cigarettes, and Hall was never known to smoke cigarettes.

Tyrone Brister testified that, when he and Mickens shared a holding cell at the courthouse on March 26, 1993, he asked Mickens why he was in the cell. Mickens answered, "They said I stabbed somebody 140 something times in the head." Mickens then lowered his voice and said, "which I did." Mickens also told Brister that "they" said he also sodomized the victim and stole his sneakers. Again, Mickens lowered his voice and said, "which I did."

*Mickens v. Commonwealth,* 247 Va. 395, 442 S.E.2d 678, 681–83 (1994).[2]

Following Mickens' unsuccessful appeal to the Supreme Court of Virginia, the Supreme Court of the United States remanded the case to the Supreme Court of Virginia for further consideration in light of *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (holding a capital defendant has a right to inform his sentencing jury that he is ineligible for parole). *See Mickens v. Virginia,*

513 U.S. 922, 115 S.Ct. 307, 130 L.Ed.2d 271 (1994). The Supreme Court of Virginia thereafter remanded the matter to the trial court for resentencing. *See Mickens v. Commonwealth,* 249 Va. 423, 457 S.E.2d 9 (1995).

At the resentencing proceedings, Mickens was represented by the same lawyers who had represented him at trial. The trial court conducted a new sentencing hearing before a jury. After hearing evidence in aggravation and in mitigation, the jury fixed Mickens' punishment at death, based upon both the "vileness" and the "future dangerousness" predicates of Virginia's death penalty statutes. *See Mickens v. Commonwealth,* 252 Va. 315, 478 S.E.2d 302 (1996), *cert. denied,* 520 U.S. 1269, 117 S.Ct. 2442, 138 L.Ed.2d 202 (1997). After conducting a post-trial hearing pursuant to Va.Code Ann. § 19.2–264.5 (Michie 1995), the Circuit Court of the City of Newport News followed the jury's recommendation and sentenced Mickens to death.

Mickens subsequently appealed his sentence. The Supreme Court of Virginia denied the appeal. *See Mickens v. Commonwealth,* 252 Va. 315, 478 S.E.2d 302, 304 (1996), *cert. denied,* 520 U.S. 1269, 117 S.Ct. 2442, 138 L.Ed.2d 202 (1997). Then, Mickens filed a petition for a writ of habeas corpus with the Supreme Court of Virginia. That petition was denied summarily without explanation of the reasons.

On February 24, 1998, Mickens filed a motion for the appointment of counsel to represent him in filing a federal habeas corpus petition. Counsel were appointed and Mickens filed a petition in which he raised the following grounds for relief.

## II. GROUNDS FOR FEDERAL HABEAS CORPUS RELIEF

Mickens' claims are restated verbatim from his petition:

*Sumner v. Mata,* 449 U.S. 539, 546–47, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981)), *cert. denied,* 118 S.Ct. 16 (1997).

---

**2.** The findings of fact made by the Supreme Court of Virginia are binding on this Court. *See* 28 U.S.C. § 2254(e)(1); *Pope v. Netherland,* 113 F.3d 1364, 1367 (4th Cir.), (citing

1. The evidence was insufficient to convict Mr. Mickens of attempted forcible sodomy because there was no evidence adduced at trial to indicate that the intent of the attacker was to attempt to forcibly sodomize Hall, especially because the act was consummated and there was no trauma to the anus of the victim.

2. The evidence was insufficient to convict Mr. Mickens of capital murder since the evidence was insufficient to prove attempted forcible sodomy and, without the predicate offense, there can be no conviction for a capital offense.

3. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel when trial counsel failed to investigate the facts surrounding the crime, and failed to request an investigator.

4. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel due to trial counsel's failure to request a psychiatric evaluation for Petitioner's sentencing, pursuant to *Ake v. Oklahoma*, 470 U.S. 68, 83, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and Va. Code § 19.2–264.3:1.

5. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because his trial counsel labored under an actual conflict of interest which adversely affected his performance; trial counsel represented both the defendant and the victim.

6. Petitioner was denied his Fifth Amendment right to due process of law and his Sixth Amendment right to the effective assistance of counsel when the trial judge of the Newport News Juvenile and Domestic Relations Court failed to inform Petitioner of the conflict of interest and inquire of the Petitioner whether he was aware of the conflict.

7. Petitioner was denied the effective assistance of counsel when counsel failed to investigate and present the defense of consent to the charge of attempted forcible sodomy, despite the obvious indications pointing to a consent defense.

8. Petitioner was denied the effective assistance of counsel when counsel failed to present any evidence in mitigation at the sentencing hearing, and when counsel presented an unreasonable closing argument at the sentencing.

9. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel because trial counsel failed to request a mistrial when the jury found him guilty· of capital murder, without finding him guilty of the underlying predicate offense, attempted forcible sodomy.

10. Petitioner was denied due process of law, and was denied the effective assistance of counsel, when he was resentenced by a jury which had not heard the evidence against him, thereby depriving the jury from considering residual doubt as a mitigating factor in determining the sentence.

11. Petitioner was denied the effective assistance of counsel by counsel's failure to effectively cross-examine crucial prosecution witnesses.

12. The refusal to excuse juror Frank Johnson for cause based solely on the juror's representations to the court denied Mickens the right to an impartial jury.

The assessment of these twelve claims must be made in perspective of certain fundamental principles which circumscribe the reach of the review of state court judgments by federal courts in habeas corpus proceedings.

## III. EXHAUSTION AND PROCEDURAL BAR

 The first of those principles is the doctrine of exhaustion which, simply stated, is that, "[i]n the interest of giving the state courts the first opportunity to consider alleged constitutional errors occurring in a state prisoner's trial and sentencing, a state prisoner must exhaust all available state remedies before he can apply for federal habeas relief." *See Breard v. Pruett,* 134 F.3d 615, 619 (4th Cir.1998) (citing *Matthews v. Evatt,* 105 F.3d 907, 910–11 (4th Cir.), *cert. denied,* 522 U.S. 833, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997)), *cert. denied* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998). "To exhaust state remedies, a habeas petitioner must fairly present the substance of his claim to the state's highest court." *See Matthews,* 105 F.3d at 911. "Fair presentation contemplates that both the operative facts and the controlling legal principles must be presented to the state court." *Id.* (internal quotations omitted). Thus, in state court, the petitioner is obligated to identify the federal constitutional right purportedly infringed, identify the facts thought to support such a violation, and to explain how those facts establish a violation of his constitutional rights. *Mallory v. Smith,* 27 F.3d 991, 994 (4th Cir.1994). It is important to remember, therefore, that "[t]he exhaustion requirement is not satisfied if the petitioner presents new legal theories or factual claims for the first time in his federal habeas petition." *Breard,* 134 F.3d at 619.

 A distinct, but related, limit on the scope of habeas corpus review in federal court is the doctrine of procedural default. Pursuant to that doctrine, if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the petitioner has procedurally defaulted his federal habeas claim in federal court. *Id.* at 619. A procedural default also occurs when a federal habeas petitioner has failed to exhaust available state remedies and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman v. Thompson,* 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Absent a showing of cause and prejudice or a fundamental miscarriage of justice, a federal habeas court is precluded from reviewing the merits of a defaulted claim.

Several of these procedural rules apply to the assessment of Mickens' claims. First, under the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), a Virginia inmate is precluded from raising claims in state habeas proceedings if they could have been raised at trial and on direct appeal but were not. Under Va. Code § 8.01–654(B)(2), "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." *Hoke v. Netherland,* 92 F.3d 1350, 1354 n. 1 (4th Cir.1996) (internal quotations omitted). Finally, under Va.Code Ann. § 8.01–654.1 (Michie 1995), capital habeas petitioners are required to submit any habeas petition within sixty days after the Supreme Court of the United States denies a petition for a writ of certiorari.

Only Claims 1, 2, and 4 have been properly presented to the Supreme Court of Virginia. Mickens contends that the default of Claims 7 through 12 is excused because he has demonstrated cause and prejudice or a fundamental miscarriage of justice. Mickens' arguments of cause sufficient to excuse the default of Claims 7 through 12 and the assertion of actual innocence as to those claims will be addressed first. Discussion of the procedural posture of Claims 1, 2, 3, 4, 5 and 6 will be assessed along with the merits of those claims.

### A. Cause Excusing Default of Claims 7 Through 12

 Claims 7 through 12 are defaulted under the principles of exhaustion and

procedural bar. To demonstrate "cause" which will excuse the default of Claims 7 through 12, Mickens must establish "that some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court at the appropriate time. *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Ineffective assistance of counsel may constitute "cause" for a procedural default under certain circumstances. *Id.* at 488, 106 S.Ct. 2639.

A topic heading in the petition suggests that Mickens can demonstrate cause and prejudice and actual innocence which will excuse the admitted default of Claim 12. *See* Pet. at 10. However, Mickens fails to specify the basis for that contention in the body of the petition, as required by the Order entered April 7, 1998. Moreover, the arguments of cause put forth by Mickens in support of his Claims 7 through 11 are simply inapplicable to Claim 12. Thus, Mickens' suggestion that he can demonstrate cause and prejudice excusing his default of Claim 12 will receive no further consideration.

 Mickens contends that ineffective assistance of his state habeas counsel excuses the acknowledged default of Claims 7, 8, 9, 10 and 11. In support of that contention, Mickens avers by affidavit that: (1) his first communication with state habeas counsel, George B. Pavek, was when Pavek handed Mickens a completed habeas petition for signature; (2) he does not read or write at a level which would allow him to have understood the contents of that petition; (3) Pavek told Mickens that he must sign the petition that day or the court would lose authority to review his case; and (4) he "neither had any input into the contents of the [state habeas] petition, nor did he have an opportunity to review the petition." (Pet. at 52.) Under those circumstances, Mickens contends that he should not bear the consequences of Pavek's failure to raise Claims 7 through 11 in the state habeas proceed-

ings. *See Deutscher v. Angelone,* 16 F.3d 981, 984 (9th Cir.1994) (refusing to find inmate's second habeas petition successive when inmate's first petition was not signed or otherwise authorized by the petitioner).

 The assertions of cause presented here by Mickens lack the legal and factual predicates to support a finding of cause. First, for an error of counsel to constitute cause, a petitioner must first possess a constitutional right to assistance of counsel. *See Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). A petitioner has no constitutional right to assistance of counsel in state habeas proceedings, even though claims of ineffective assistance of trial counsel can only be raised on state collateral review. *See Mackall v. Angelone,* 131 F.3d 442, 449 (4th Cir.1997) (en banc), *cert. denied,* 522 U.S. 1100, 118 S.Ct. 907, 139 L.Ed.2d 922 (1998); *Weeks v. Angelone,* 176 F.3d 249, 273–74 (4th Cir.)(reiterating that the alleged ineffective assistance of habeas counsel cannot constitute cause to excuse a petitioner's defaulted ineffective assistance of trial counsel claims), *cert. granted on other grounds,* —— U.S. ——, 120 S.Ct. 30, 144 L.Ed.2d 833 (1999); *Satcher v. Netherland,* 944 F.Supp. 1222, 1263–64 (E.D.Va.1996), *rev'd on other grounds,* 126 F.3d 561 (4th Cir.), *cert. denied,* 522 U.S. 1010, 118 S.Ct. 595, 139 L.Ed.2d 431(1997). Under the law in this circuit, there is no constitutional right to counsel on state habeas review and thus ineffective assistance of state habeas counsel (even if shown) does not constitute cause.

Secondly, Mickens' suggestion that limitations on his literacy capacity precluded participation in the state habeas proceedings is completely lacking in merit. The record shows that Mickens could, and did, read his state habeas petition.[3] (State Habeas Pet. at 31.) Even if that were not so, Mickens' notarized signature, attached to his state habeas petition reflects, "I have

---

**3.** (5/20/93 Hr. T. at 117, 139); (3/29/96 Hr. T. at 22); (1/13/99 Hr. T. at 196.)

read, and **have had read to me,** the foregoing petition for a writ of habeas corpus and attached motions, and papers." *Id.* (emphasis added). Hence, that ground for cause is rejected as entirely lacking in factual support. *See Kornahrens v. Evatt,* 66 F.3d 1350, 1359 (4th Cir.1995) (noting that once a court finds the absence of cause, it should not consider the issue of prejudice so as to avoid making alternative holdings).

### B. Actual Innocence

 Initially, in his federal petition for a writ of habeas corpus, Mickens asserted that the default of Claims 7 through 11 [4] should be excused because "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To pass defaulted claims through the actual innocence portal, Mickens must show that "it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* Subsequently, Mickens conceded to this Court that he had failed to present sufficient evidence to show that he was actually innocent. (10/7/98 Hr. T. at 44.) The record demonstrates the wisdom of that concession. *See infra* Sec. IV. For the foregoing reasons, Claims 7 through 12 are defaulted and will be dismissed.

### IV. CLAIMS 1 AND 2: SUFFICIENCY OF THE EVIDENCE

In Claim 1, Mickens asserts that the evidence was insufficient to sustain a conviction of attempted forcible sodomy and that, absent sufficient proof of that underlying predicate offense, the conviction for the murder of Hall subsequent to the attempted forcible sodomy also must fail (Claim 2).

 A federal habeas petitioner is entitled to relief on a challenge to the sufficiency of the evidence only if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 324, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In Virginia, the elements of attempted forcible sodomy include an intent forcibly to sodomize an individual and a direct, but ineffectual, act toward achievement of sodomy. *See Mickens v. Commonwealth,* 247 Va. 395, 442 S.E.2d 678, 687 (1994).

On direct appeal, Mickens claimed that: the Commonwealth failed to prove that he 'intended to commit forcible sodomy or that he did any act towards the commission of the act that amounted to the commencement of the act.' He further contends that the Commonwealth failed to prove that he was the criminal agent in Hall's death.

*Id.*

The Supreme Court of Virginia held that the evidence "clearly established the requisite elements of attempted forcible sodomy":

Hall's body, naked from the waist down, was found lying face down on a mattress under an abandoned building. His legs were spread apart 12 inches. A white lubricant was on Hall's buttocks near his anus. African–American pubic hairs found on Hall's buttocks were like Mickens' pubic hairs in "all identifiable microscopic characteristics." Tissue attached to the roots of the hairs, indicating that the hairs had been forcibly removed, was consistent with Mickens' having rubbed his genitals against Hall's buttocks. Bloody "transfer" stains were evident on Hall's thighs, and a semen stain found on the mattress cover was consistent with Mickens' DNA pattern. Additionally, Mickens' statements to Officer Seals and to Tyrone Brister confirmed that Mickens had attempted to commit forcible sodomy.

*Id.* at 688; *see Wilson v. Greene,* 155 F.3d 396 406–7 (4th Cir.) (rejecting similar chal-

---

4. There is no reference to actual innocence in the body of Claim 12.

lenges to sufficiency of the evidence for attempted rape), *cert. denied,* —— U.S. ——, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998).

 In his federal petition, Mickens suggests, for the first time, that the evidence was insufficient to sustain that conviction because the evidence failed to show that "Mr. Hall was subjected to any sexual activity against his will, by threat, force or intimidation [and, according to Mickens] ... the evidence indicated that Mr. Hall went to the location voluntarily." (Pet. at 15.) That theory is defaulted because it has never been presented previously to the state courts. *Matthews v. Evatt,* 105 F.3d 907, 911 (4th Cir.), *cert. denied,* 522 U.S. 833, 118 S.Ct. 102, 139 L.Ed.2d 57 (1997).

 Moreover, the theory ignores the fact that Hall exhibited bruises on the front of his neck, that he sustained multiple stab wounds, and that there was a transfer stain on the back of his thighs.[5] (5/26/93 Tr. T. at 509–10.) The bruises on Hall's neck and the stab wounds are consistent with use of a choke hold and a knife, both of which are indicia of the use of force. And, the transfer stains on the back of Hall's thighs indicate that the killer was stabbing Hall from behind while attempting to sodomize Hall, or before having done so. That evidence forecloses the possibility that any rational finder of fact could conclude that Hall was engaging in consensual sexual activity immediately before his death. For the foregoing reasons, Claims 1 and 2 will be dismissed.

## V. CLAIMS 3 AND 4: ALLEGED INEFFECTIVE ASSISTANCE OF COUNSEL

In Claims 3 and 4, Mickens contends that he was denied effective representation by trial counsels' inadequate pretrial investigation (Claim 3) and by trial counsels' failure to request a psychiatric evaluation for sentencing (Claim 4).

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that to demonstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. 2052. At bottom, in assessing prejudice, it is important to focus on "whether the result of the proceeding was fundamentally unfair or unreliable." *Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

 The deficient performance facet of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." 466 U.S. at 688, 104 S.Ct. 2052. To satisfy this facet of *Strickland,* the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 687–88, 104 S.Ct. 2052. The standard for deficient performance is "not merely below average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1357 (4th Cir.1992). Furthermore, in order to avoid the distorting effects of hindsight, a court, on federal habeas review, is required to evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Finally, the defendant must overcome the "strong presumption ... that, under the circumstances, the challenged action, 'might be considered sound trial strategy' " (if, of course, the challenged action was a matter of trial strategy). *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). With these principles in mind, it

---

**5.** Bloody "transfer" stains occur when an object comes into contact with blood and there- after comes in contact with another surface, thereby leaving a stain on that other surface.

is appropriate to assess the arguments made by Mickens in Claims 3 and 4.

## A. Pretrial Investigation (Claim 3)

 In state court, Mickens alleged that trial counsel were ineffective for failing to request the appointment of a criminal investigator, which "prevented the petitioner from developing and investigating any issues or facts that may have pointed to the fact that *someone else may have been involved.*" (State Habeas Petition at 23, 27–8.) (emphasis added). In Claim 3 of this federal petition, Mickens asserts that he was denied the effective assistance of counsel because trial counsel: (1) failed to investigate a consent defense; and (2) failed to request an investigator to gather evidence to support a consent defense or to gather mitigating evidence. The record shows that Mickens has never given the Virginia courts a fair opportunity to evaluate the adequacy of counsels' investigation or their failure to request the appointment of an investigator to explore evidence of consent and mitigating circumstances. Claim 3, therefore, is defaulted and will be dismissed.[6]

## B. Psychiatric Examination (Claim 4)

 In Claim 4, Mickens contends that trial counsel were deficient for failing to request a psychiatric examination of petitioner for purposes of sentencing. Mickens suggests that, if trial counsel had requested such an examination, the expert could have testified that Mickens had sustained organic brain damage and therefore had a diminished mental capacity. That evidence would have been mitigating of the offense, says Mickens. The challenge to the performance of trial counsel on this ground is "a product of hindsight and fails

to address the facts reasonably relied upon by counsel at the time [of trial and sentencing]." *Roach v. Martin,* 757 F.2d 1463, 1478 (4th Cir.1985).

For instance, before trial, one of Mickens' trial counsel, Bryan Saunders, asked the court to have Mickens evaluated for competence to stand trial and for sanity at the time of the offense. (Resp.'s Mot. to Dis. Ex. C. at ¶ 7.) Pursuant to that request, the court appointed Dr. Killian to conduct evaluations of Mickens. Dr. Killian determined that Mickens was sane at the time of the offense and that he was competent to stand trial. *Id.* Counsel's performance cannot be faulted on that issue.

Also, in preparation for the penalty phase, trial counsel reviewed Mickens' prison file. *Id.* at ¶ 8. The file contained a notation which indicated that Mickens may have organic brain damage as a result of sniffing inhalants.[7] *Id.* Saunders conveyed that information to Dr. Killian and asked him whether there was anything in his examinations that would confirm the notation. *Id.* Dr. Killian told Saunders that "he did not have any reason to suspect any problem of brain damage," but he offered to test Mickens. *Id.* Therefore, arrangements were made to transport Mickens for testing, but Mickens refused to take the test. *Id.* Nonetheless, at his first sentencing, Mickens presented evidence, through his testimony and that of his mother, which suggested his aberrant behavior was linked to his history of having sniffed glue.

 To have been effective, counsel was not required to second guess Dr. Killian's conclusion or to devote additional time pursuing what appeared to have been an unfruitful line of investigation. *Wilson v. Greene,* 155 F.3d 396, 403 (4th Cir.), *cert.*

---

6. Additionally, Claim 3 lacks substantive merit. In light of the facts facing counsel, *see infra* Sec. VI(E)(1), counsel reasonably chose not to pursue a consent defense. Furthermore, the lack of mitigating evidence is attributable to absence of such evidence rather than the failings of counsel.

7. The trial transcripts reflect that Mickens was lucid and rational. Mickens does not assert that trial counsel were aware of any other evidence which would cause them to doubt his mental condition.

*denied,* 119 S.Ct. 536, 119 S.Ct. 536, 142 L.Ed.2d 441 (1998). Moreover, "there is no constitutional basis for a rule that would require a psychiatric evaluation in every capital case." *Clanton v. Bair,* 826 F.2d 1354, 1358 (4th Cir.1987). Thus, "when a seemingly lucid and rational client rejects the suggestion of a psychiatric evaluation and there is no indication of a mental or emotional problem, a trial lawyer may reasonably forego insistence upon an examination." *Id.* In this instance, trial counsel were assured by both Mickens' conduct and a mental health expert that significant mitigating evidence pertaining to organic brain damage simply was not available. Under such circumstances, counsel reasonably chose not to insist on further mental evaluations.

Finally, although it was reasonable initially to have cast Mickens' purported inhalant induced mental infirmity into the mix of mitigating evidence, an extended defense focused on that issue was unlikely to have been of benefit to Mickens because "[m]ental health evidence like that of [a petitioner's] organic brain dysfunction is a double-edged sword that might as easily have condemned [petitioner] to death as excused his actions." *Truesdale v. Moore,* 142 F.3d 749, 755 (4th Cir.1998). Here, the mitigating value of such evidence (had it been offered) would have been obscured by the fact that Mickens' purported mental infirmity was caused by sniffing glue and that Mickens continued to abuse inhalants while incarcerated. For the foregoing reasons, Claim 4 will be dismissed.

## VI. CLAIMS 5 AND 6: CONFLICT OF INTEREST

In Claim 5, Mickens contends that he was denied effective assistance of counsel because his lead trial counsel, Bryan Saunders, was representing the victim, Timothy Hall, at the time of Hall's murder. In Claim 6, Mickens makes the related claim that the failure of the Newport News Juvenile and Domestic Relations Court (hereinafter "JDR Court") to inquire into the conflict denied him due process and effective assistance of counsel. The procedural history pertinent to these claims is set forth below (and it is undisputed):

- On February 21, 1992, Janet Heywood, Timothy Hall's mother, swore out a warrant for assault and battery against her son. Heywood alleged that, on February 16, 1992, Hall grabbed her by the arms and shoved her to the ground.

- On or about March 13, 1992, Timothy Hall was charged by Newport News police with possession of a concealed weapon (a serrated bread knife wrapped in paper). Hall was directed to appear before the JDR Court for the assault and concealed weapons charges on March 20, 1992.

- At the March 20, 1992 hearing, Substitute Judge Paul Criver, Jr., of the JDR Court appointed Bryan Saunders to represent Hall and the hearing was continued until April 3, 1992.

- Sometime between March 20 and March 28, 1992, Hall came to Saunders' office for an interview which lasted fifteen to thirty-minutes. (1/13/93 Hr. T. at 98.)[8] The discussion was confined to the circumstances surrounding each of the charged crimes. (12/23/98 Dep. at 11–26.)

- On March 28, 1992, Hall was seen alive for the last time.

- On March 30, 1992, Hall's body was discovered.

- On April 3, 1992, Judge Foster of the JDR Court removed the charges against Hall from the docket and dismissed them, noting that the defendant is deceased.

**8.** On January 13, 1999, this Court conducted an evidentiary hearing on Claims 5 and 6. Citations to the record of that hearing will be abbreviated as "1/13/99 Hr. T." Also, Mickens has tendered a copy of the transcript of Saunders' deposition conducted on December 23, 1998. Citations to that record will be abbreviated as "12/23/98 Dep."

On the same date, Saunders appeared at the JDR court for a hearing on Hall's assault and concealed weapons charges. (1/13/99 Hr. T. at 96–97.) Someone (the identity of whom Saunders does not recall) told Saunders that Hall was dead and that the pending cases had been dismissed. *Id.* at 97.

- On April 4, 1992, Mickens was arrested.

- On April 6, 1992, Judge Foster of the JDR Court appointed Saunders to represent Mickens.

It is undisputed that Mickens was unaware of Saunders' previous representation of Hall until federal habeas corpus proceedings were initiated. Even then, the discovery of these facts was purely fortuitous. In particular, Mickens' federal habeas counsel visited the JDR Court to review Mickens' JDR file. Counsel asked the clerk on duty for any files involving Timothy Hall. Of course, files of a juvenile are confidential and should not have been produced without a court order. *See* Virginia Code Ann. § 16.1–305 (Michie 1996). Nonetheless, a clerk of the JDR Court inadvertently produced Hall's file on the assault and concealed weapons charges. It was then that federal habeas counsel discovered that Saunders previously had represented Hall and requested a copy of the files. The clerk's supervisor intervened, discovered that Hall's file had been improperly disclosed and refused to allow counsel any further access to Hall's files.

Subsequently, Hall's files were produced to Mickens' counsel by judicial process.

The Respondent has moved to dismiss Claims 5 and 6 on the ground that they are procedurally barred because they were not presented in Mickens' first state habeas petition. *See* Va.Code. §§ 8.01–654(B)(2) [9]; 8.01–654.1.[10] Mickens counters that, in establishing a conflict of interest on the part of Saunders, he has shown cause and prejudice excusing the default.

### A. Cause Excusing Default of Claims 5 and 6

Mickens contends that he has satisfied the cause requirement because the facts supporting the conflict of interest claim were "not reasonably available" before the completion of his state proceedings. *McCleskey v. Zant*, 499 U.S. 467, 493–94, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986)). "The question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition." *Barnes v. Thompson*, 58 F.3d 971, 975 (4th Cir.1995). Here, Saunders' silence and state law requirements for secrecy of juvenile court records operated together to preclude Mickens from raising the conflict of interest claims in his state habeas petition.

It is undisputed that Mickens did not know of the conflict of interest here asserted. And, there were only two sources

---

**9.** Under Virginia law, "a petitioner is barred from raising any claim in a successive petition if the facts as to that claim were either known or available to petitioner at the time of his original petition." *Hoke v. Netherland*, 92 F.3d 1350, 1354 n. 1 (4th Cir.1996) (citing 8.01–654(B)(2)). Whether this claim was reasonably available will be considered as part of the discussion of cause and prejudice (see pp. 600–01 *infra*).

**10.** Va.Code § 8.01–654.1 requires capital defendants to file a habeas petition within sixty days of the denial of his petition for certiorari. The last paragraph of that section provides,

"notwithstanding the time restrictions otherwise applicable to the filing of a petition for a writ of habeas corpus, an indigent prisoner may file such a petition within 120 days following appointment, made under § 19.2–163.7, of counsel to represent him." Neither Mickens nor Greene suggests this sentence provides Mickens with an opportunity to file another habeas petition with the Supreme Court of Virginia. *Cf. Graham v. Angelone*, No. 99–4, 191 F.3d 447, 1999 WL 710385, at *10 (4th Cir. Sept.13, 1999) (refusing to extend time for filing capital state habeas petition when new counsel appointed shortly before the deadline).

from which Mickens could have discovered that Saunders had represented Hall before representing Mickens: Saunders and the Newport News JDR Court. Saunders kept silent, thereby breaching his duty of disclosure. State law foreclosed any access to the JDR Court. On this record, Mickens' failure to explore either of these sources before completion of his state habeas proceedings cannot be characterized as unreasonable.

Because the primary responsibility for discerning conflicts of interests and revealing them to clients and to the courts rests with counsel, Saunders' silence impliedly assured Mickens that there were no potential conflicts from the representation of any previous clients *See Cuyler v. Sullivan*, 446 U.S. 335, 346, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "Defense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly if a conflict of interest arises during the course of a trial." *Id.* Whether a lawyer can represent multiple or successive clients is circumscribed by the lawyer's inescapable duty to "explain any circumstances that might cause a client to question his undivided loyalty." Va.Code of Professional Responsibility EC 5–19 (Michie 1992). Saunders' representation of the murder victim, at the time of the murder, is undoubtedly a circumstance "that might cause a client to question his undivided loyalty." *Id.*

Therefore, Saunders was obligated either to have declined appointment to the Mickens' case, or to have fully disclosed to Mickens the fact of his previous representation of Hall and the possible effects that his previous representation of Hall might have on his ability to represent Mickens. *Dowell v. Commonwealth*, 3 Va.App. 555, 351 S.E.2d 915, 917–18 (1987). And, the full disclosure option also obligated Saunders to explain that Mickens' consent would be required before Saunders could continue the representation. *See* Va.Code of Professional Responsibility DR 5–105; EC 5–15; EC 5–17; EC 5–19.

Saunders also was required to have disclosed the previous representation to the appointing court and that would have meant that the facts surrounding the previous representation would have been fully explained on the record. In other words, Saunders' representation would have been permitted only after a full inquiry. *See Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 346–47, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Holloway v. Arkansas*, 435 U.S. 475, 485, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Kirkpatrick v. Butler*, 870 F.2d 276, 284 (5th Cir.1989); *Edmonds v. Jabe*, 874 F.Supp. 730, 736 (W.D.Va.1995) (finding conflict of interest claim was not reasonably available when only mention of conflict was in a single sentence buried in a psychiatric report prepared for sentencing). Considering Saunders' silence in the face of these duties and the absence of any indication in the trial record that a conflict might have existed, Mickens had no reason to even consider the possibility that a conflict existed. *See Edmonds*, 874 F.Supp. at 736. Furthermore, his state habeas counsel had no reason to explore the matter.

Nonetheless, and without any credible decisional support, the Commonwealth persists in asserting that Claims 5 and 6 were reasonably available to state habeas counsel because federal habeas counsel discovered the factual basis of the claim. It is charitable to call that argument frivolous because the fortuitous circumstances by which federal habeas counsel discovered the truth about Saunders' conflict prove beyond question that Mickens did not fail in his duty to inquire in the state court proceedings. *See Amadeo v. Zant*, 486 U.S. 214, 224, 108 S.Ct. 1771, 100 L.Ed.2d 249 (1988). Mickens had no reason to suspect that Saunders would violate the disclosure obligations imposed on him by state law. Nor is there fault to be found in state habeas counsel's failure to request Hall's JDR files because they were imbued with confidentiality by state law. Federal

habeas counsel uncovered the conflict by virtue of the error of the Clerk of the JDR Court. And, when that error was discovered, the records were taken from federal habeas counsel. They were disgorged again only by virtue of a subpoena. Thus, the factual predicate for Claims 5 and 6 simply was not available to Mickens in state court nor was it discoverable through the exercise of diligent investigation. To argue otherwise is disingenuous. On this record, Mickens has established cause, the first step for excusing his default of Claims 5 and 6.

### B. Prejudice Excusing Default of Claims 5 and 6

■ To establish actual prejudice, Mickens "must shoulder the burden of showing, not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). Where the defaulted claim involves an actual conflict of interest on the part of counsel, the prejudice inquiry incorporates the test for establishing the underlying claim. *See Williams v. French*, 146 F.3d 203, 210–13 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1061, 143 L.Ed.2d 66 (1999). Thus, it is necessary now to evaluate the underlying claims.

### C. The Test For Establishing An Actual Conflict of Interest

■ To demonstrate that he was deprived of the Sixth Amendment right to conflict-free counsel, Mickens can proceed on one of two theories: (A) that Saunders had a potential conflict of interest that prejudiced his defense, *see Strickland v.*

*Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); or (B) that "[1] an actual conflict of interest [2] adversely affected his lawyer's performance" *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). *See Enoch v. Gramley*, 70 F.3d 1490, 1496 (7th Cir. 1995); *United States v. Swartz*, 975 F.2d 1042, 1047 (4th Cir.1992). Mickens proceeds on the latter theory.

#### 1. Actual Conflict

■ In the context of multiple or simultaneous representations, a lawyer has an actual, as opposed to a potential, conflict of interest when the interest of the petitioner and the other client "diverge[d] with respect to a material factual or legal issue or to a course of action."[11] *Gilbert v. Moore*, 134 F.3d 642, 652 (4th Cir.) (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 356 n. 3, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (Marshall, J., concurring in part and dissenting in part)), *cert. denied*, 119 S.Ct. 103 (1998). It is often difficult to ascertain whether the clients' interests actually diverged in the context of successive representation. *Freund v. Butterworth*, 165 F.3d 839, 859 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999); *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir.1991); *United States v. Young*, 644 F.2d 1008, 1012 (4th Cir.1981).

Keenly aware of the delicate privilege issues which often arise in successive representation cases, the Eleventh Circuit has adopted a refined version of the *Cuyler* test specifically for that sort of case. *See Smith v. White*, 815 F.2d 1401, 1406 (11th Cir.1987).[12] The test is discussed at length in the Eleventh Circuit's recent decision in *Freund v. Butterworth*, 165 F.3d 839 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——,

---

11. A potential conflict of interest exists if the interests of the defendant may place the lawyer under inconsistent duties at some time in the future. *Cuyler*, 446 U.S. at 356, n. 3, 100 S.Ct. 1708.

12. The United States Court of Appeals for the Seventh Circuit has adopted the *Smith* test for successive representation cases. *See Enoch v. Gramley*, 70 F.3d 1490, 1496 (7th Cir.1995). This opinion refers to that test as the "*Freund* test".

120 S.Ct. 57, 145 L.Ed.2d 50 (1999). In *Freund,* the court held that, in the context of successive representation, a defendant does not demonstrate a disqualifying divergence of interests unless he shows either that "(1) counsel's earlier representation ... was substantially and particularly related to counsel's later representation of petitioner, or (2) counsel actually learned particular confidential information during the prior representation ... that was relevant to petitioner's later case." *Freund,* 165 F.3d at 859 (internal quotations and citations omitted). "Even proof of **both** substantial relatedness and confidential information, however, may not necessarily be enough to demonstrate 'inconsistent interests' in a successive representation case." *Id.* The situation may require the defendant to introduce, "other proof of inconsistent interests." *Id.* (quoting *Smith,* 815 F.2d at 1406).

The two scenarios described in the *Freund* test pose the most obvious risks of an actual conflict in the context of successive representation. *See United States v. Kliti,* 156 F.3d 150, 154 (2d Cir.1998); *United States v. Young,* 644 F.2d 1008, 1012 (4th Cir.1981). However, neither the Supreme Court nor the Fourth Circuit has restricted proof of a conflict to those two scenarios. *See, United States v. Magini,* 973 F.2d 261, 263–64 (4th Cir.1992) (directing district court to hold an evidentiary hearing to determine whether client's and lawyer's pecuniary interests diverged). Given the gravity of the charge against Mickens and the somewhat predictable consequence of rejecting his petition, it is imperative that, through "other proof of inconsistent interests," Mickens can carry his burden under the first prong of *Cuyler,* if the interests actually diverged. In this instance, Mickens argues that Saunders' irreconcilable ethical obligations to Hall and Mickens coupled with Saunders' desire to conceal the successive representation constitute "other proof of inconsistent interests". *See infra* Sec. VI(D)(2).

## 2. Adverse Effect

■ Mickens erroneously contends that an adverse effect can be established simply by showing that "but for the attorney's actual conflict of interest, there is 'a reasonable likelihood that counsel's performance somehow would have been different.'" *Stoia v. United States,* 22 F.3d 766, 771 (7th Cir.1994) (quoting *Frazer v. United States,* 18 F.3d 778, 787 (9th Cir.1994) (Beezer, J., concurring)). In fact, a petitioner must demonstrate that counsel's performance was adversely affected by the conflict. *Stoia,* 22 F.3d at 771 (noting the lapse in counsel's performance must be "contrary to the defendant's interests"). Thus, even though the petitioner is not required to demonstrate prejudice, he must show that the conflict was "deleterious" or "harm[ful]" to counsel's advocacy. *See Burger v. Kemp,* 483 U.S. 776, 785, 788, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). A petitioner satisfies the second facet of *Cuyler* "if the attorney took action on behalf of one client that was necessarily adverse to the defense of the other or failed to take action on behalf of one because it would adversely affect the other." *Williams v. French,* 146 F.3d 203, 212 (4th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1061, 143 L.Ed.2d 66 (1999).

■ To prove an adverse effect, a petitioner must satisfy three elements:

First, he must point to some plausible alternative defense strategy or tactic [that] might have been pursued. Second, he must demonstrate that the alternative strategy or tactic was reasonable under the facts. Because prejudice is presumed, the petitioner need not show that the defense would necessarily have been successful if the alternative strategy or tactic had been used, rather he only need prove that the alternative possessed sufficient substance to be a viable alternative. Finally, he must show some link between the actual conflict and the decision to forgo the alternative strategy of defense. In other words, he must

establish that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.

*Freund,* 165 F.3d at 860. *Accord Williams,* 146 F.3d at 213 (requiring similar elements for demonstrating adverse effect in the context of multiple representation); *United States v. Tatum,* 943 F.2d 370, 376 (4th Cir.1991).

These basic principles inform the analysis of the conflict of interest claims advanced by Mickens.

## D. Proof Of An Actual Conflict

 The *Freund* test, with the modification that Mickens may establish an actual conflict solely through "proof of other inconsistent interests," will be applied to assess the merits of Mickens' claims. At this stage of the analysis, it is insufficient for Mickens merely to suggest what might have animated Saunders' conduct. Mickens must demonstrate, from the state court record and the evidence adduced in these proceedings, that an actual conflict of interest adversely affected Saunders' representation.

Mickens contends that he has proven the existence of actual conflict because: (1) Saunders' representation of Hall was substantially and particularly related to Saunders' later representation of Mickens; (2) Saunders' ethical duty of loyalty to Hall, and Saunders' own self-interest were irreconcilable with his duty to zealously represent Mickens; and (3) Saunders' actually learned particular confidential information during his representation of Hall that was relevant to Mickens' case. *See Freund v. Butterworth,* 165 F.3d 839, 859 (11th Cir.) (en banc), *cert. denied,* ─── U.S. ───, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999).

### 1. Substantial Relatedness

 Substantial relatedness exists when " 'the present action and the past representation concern the **very same** subject matter' " or when the prior representation concerned the " 'same criminal transactions' and 'same events' at issue in defendant's case". *Freund v. Butterworth,* 165 F.3d 839, 864 (11th Cir.) (en banc) (quoting *Kraft, Inc. v. Alton Box Board Inc.,* 659 F.2d 1341, 1345 (1981) and *United States v. Martinez,* 630 F.2d 361, 362 (5th Cir.1980)), *cert. denied,* 120 S.Ct. 57, 68 U.S.L.W. 3223 (Oct. 4, 1999). Saunders' representation of Hall was very limited in scope and duration. Specifically, Saunders represented Hall on a concealed weapons charge and an assault on his mother. The representation did not arise out of the "very same subject matter" as the charges facing Mickens. Nor did it involve the same criminal transactions or events. Mickens strains to find a correlation by arguing that the location of Hall's arrest for the concealed weapon charge indicates that he was a prostitute and thus consented to the sexual activity with Mickens.[13] (Pet.'s Resp. to Feb. 2 1999 Order at 22.) Hall's arrest, within a mile or so of his residence, even if it was in a high crime area, does not suggest that he was a prostitute, much less that he consented to have sex with Mickens. (5/26/93 Tr. T. at 562; 1/13/99 Hr. T. at 201.) Mickens also contends that "[b]y its very nature the previous representation of the murder victim is substantially related to the defense of the person accused of the murder." (Pet.'s Resp. to Feb. 2, 1999 Order at 13.) The weight of authority refutes that contention. *See Crisp v. Duckworth,* 743 F.2d 580, 588 (7th Cir.1984) (finding no conflict when defense counsel previously represented murder victim in unrelated criminal action); *Kirkpatrick v. Butler,* 870 F.2d 276, 284 (5th Cir.1989) (finding no conflict

**13.** Hall was charged with carrying a concealed weapon at 27th and Marshall streets in Newport News. (Probable Cause Statement, United States District Court Clerk's Record # 23.) The arrest warrant for the charge listed Hall's address at 83–28th Street, # D–4, Newport News, Virginia. The evidence does not indicate that the intersection of 27th and Marshal streets was an area frequented by prostitutes.

where defense counsel had friendship with, and had in the past represented, members of murder victim's family); *Moseley v. Scully,* 908 F.Supp. 1120 (E.D.N.Y.1995) (finding no actual conflict where counsel previously represented murder victim on unrelated charges); *Dixson v. Quarles,* 627 F.Supp. 50 (E.D.Mich.) (finding no actual conflict even though defense counsel previously represented the murder victim), *aff'd* 781 F.2d 534, 535 (6th Cir.1985). Mickens has failed to demonstrate a correlation, much less a substantial and particular relationship, between Saunders' representation of Hall for assault and possession of a concealed weapon and his representation of Mickens on attempted forcible sodomy and capital murder charges.

## 2. Divergent Ethical Interests

 Mickens next argues that Saunders' ethical duties, and his desire to conceal the breaches of those duties, left Saunders hopelessly adrift in a fog of torn and conflicting loyalties. *See United States v. Tatum,* 943 F.2d 370, 377 (4th Cir.1991). Mickens contends that the determination whether there was an actual conflict under the Sixth Amendment is "inextricably intertwined" with an analysis of Saunders' ethical duties and the breach of those duties. Certainly prevailing norms of practice, as reflected in the state codes of professional responsibility, are useful guides for evaluating the ethical obligations of counsel and how a competent lawyer must resolve potential conflicts. *See Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). At the threshold, it is now settled that "[t]he effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflict of interests can lead to ineffective representation." *Tatum,* 943 F.2d at 375. However, the "breach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of

assistance of counsel." *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986); *see Lightbourne v. Dugger,* 829 F.2d 1012, 1023 n. 12 (11th Cir.1987). "[U]ntil a defendant shows that his counsel **actively** represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler,* 446 U.S. at 350, 100 S.Ct. 1708 (emphasis added).

When Saunders was appointed to represent Mickens in the capital murder of Hall, Saunders was obligated to consider the ethical problems posed by the appointment because Saunders' duty to zealously represent Mickens might be compromised by his loyalty to Hall, including his obligation to preserve Hall's secrets and confidences. *See* Va.Code Prof'l Responsibility DR 4–101, EC 4–6, Canon 7 (Michie 1992).[14] Moreover, even if Saunders did not believe that the representation would ripen into an actual conflict of interest, the choice was not his alone. *Id.* EC 5–19. Mickens contends that his interests were further compromised by Saunders' attempts to conceal his ethical breaches. However, the evidence shows that, regrettably, Saunders never struggled with the ethical issues envisioned by Mickens. (1/13/99 Hr. Tr. at 220, 228.)

To begin, the record here reflects that, as far as Saunders was concerned, his allegiance to Hall, "[e]nded when I walked in the courtroom and they told me he was dead and the case was gone." (1/13/99 Hr. Tr. at 156-7, 218). As Mickens' counsel, Saunders coldly viewed Hall not as former client, but rather as "a demographic situation which was disastrous as far as Mickens was concerned." *Id.* at 156. That view is remarkably wrong given that Saunders was obligated to preserve any confidence obtained from Hall. *Swidler & Berlin v. United States,* 524 U.S. 399, 118 S.Ct. 2081, 2086, 141 L.Ed.2d 379 (1998).

---

**14.** Under Virginia law, even the fact that there had been juvenile charges against Hall as well as the information in the charging documents arguably constituted confidential information. *See* Virginia Code Ann. § 16.1–305 (Michie Supp.1992).

However, Saunders testified that his representation of Mickens was not hampered by the duty to preserve Hall's purported confidences. Of course, for purposes of the issue under consideration, the court "accords great weight to a lawyer's perception of a conflict," because it is tasked with evaluating what considerations actually animated Saunders' actions, rather than what obligations should have influenced his actions. *United States v. Young*, 644 F.2d 1008, 1014 (4th Cir.1981). Thus, whether particular information is confidential under Virginia law while important, is not dispositive of whether Saunders deemed the information to be confidential.

According to Saunders, he did not perceive that his previous representation of Hall presented an actual conflict in representing Mickens. (1/13/99 Hr. T. at 108–11, 214, 223, 228; 12/23/98 Dep. at 86.) That perception was animated by Saunders' conclusion that he did not obtain any confidential information from Hall (1/13/99 Hr. T. at 218–19), and that "[n]othing I knew or did or had anything to do with Mr. Hall had anything to do with [Mickens'] case." *Id.* at 228. Without condoning the inexcusable failure to disclose the previous representation of Hall, the Court concludes that, as a factual matter, Saunders did not believe that any "continuing duties to [a] former client[ ] [might] interfere with his consideration of all facts and options for his current client." *United States v. Tatum*, 943 F.2d 370, 376 (4th Cir.1991).

### 3. Relevant Confidential Information

Although it is inconceivable that Saunders obtained no confidential information from Hall, (1/13/99 Hr. T. at 219), the

record here confirms that Saunders did not learn any confidential information from Hall that was **relevant** to Mickens' defense either on the merits or at sentencing. *Freund v. Butterworth*, 165 F.3d 839, 865 (11th Cir.) (en banc), *cert. denied*, —— U.S. ——, 120 S.Ct. 57, —— L.Ed.2d —— (1999). Saunders met with Hall on one occasion for a total of fifteen to thirty minutes. (1/13/99 Hr. T. at 98.) Through his representation of Hall, Saunders learned that: (a) Hall had been charged with carrying a concealed weapon at the intersection of 27th Street and Marshall in Newport News; (b) Hall's mother had pressed charges against him for assault, but she was not interested in prosecuting the case (1/13/99 Hr. T. at 155); and (c) Hall was not living with his mother at the time of his death. As discussed fully below, that information was irrelevant to Mickens' defense.[15]

### E. Adverse Effect: The Purported Manifestation of the Conflict

Mickens asserts that Saunders' conflict caused: (1) his failure to raise a consent defense; (2) the failure to investigate or raise any negative information about Hall; (3) the failure to engage in meaningful plea negotiations; and (4) the failure to apprise the sentencing court of Hall's pending charges or his strained relationship with his mother.[16] Each of these will be measured against the *Freund* test for ascertainment of an adverse effect (see p. 603–04 *supra*).

### 1. Consent Defense

Mickens asserts that the conflict foreclosed presentation of the defense that Hall was killed during a sexual encounter to which he had consented. That defense,

---

**15.** For example, Hall's criminal history might have had some relevance to Mickens' case, if Mickens' testimony had not foreclosed any theory of self-defense.

**16.** By Order entered February 2, 1999, the Court stated, "[r]eview of the adverse affect prong, for the habeas petition will be limited

to instances listed" "in separately numbered paragraphs" in the brief in response to that Order. Accordingly, the Court deems Mickens to have abandoned claims of adverse affect alleged in the initial petition but not realleged in the response to the February 2, 1999 Order.

if successful, would have precluded capital punishment. Mickens points to the following facts that made consent a plausible defense strategy: (a) there were no "defensive" stab wounds;[17] (b) there was no evidence that Hall was forced to the secluded area where he was found; (c) there were rumors that Hall was a male prostitute and that the area where Hall's body was found was a known gathering place for homosexuals; (d) there was no blood mixed with Mickens' semen stain on the mattress; and (e) the mattress where Hall's body was found had been used for sexual activity in the past.

Even if it is assumed that those five facts would have supported a consent defense, the record shows that other facts foreclosed presentation of consent as a plausible alternative defense strategy. First, Saunders knew that there also was evidence that Hall sometimes went to the area where he was murdered simply to watch the water. (1/13/99 Hr. T. at 174, 205; 12/23/98 Dep. at 71.) Second, there were blue marks on Hall's neck which evinced use of a choke hold on Hall, a circumstance inconsistent with consent. (8/20/93 Hr. Tr. at 25; 12/23/98 Dep. at 70.) Third, the bloody transfer stains on the back of Hall's thighs indicated that the attacker stabbed Hall before or during the attempted sexual activity, thereby making consent a rather implausible alternative theory. As Keeling, Mickens' other counsel, remarked, "I would imagine that when the choking of the victim or the stabbing of the victim started happening that [any] consent would have been revoked." (1/13/99 Hr. T. at 33.) Finally, and most importantly, Mickens never suggested that consent was a viable line of defense (12/23/98 Dep. at 67, 68, 73). To the con-

trary, Mickens repeatedly professed that he had no involvement with Hall in any way. That persistent representation by Mickens encouraged Saunders to conclude that a consent defense did not exist. (1/13/99 Hr. Tr. at 68–70, 77). Mickens repeatedly informed counsel that he did not even know Hall and that he had nothing to do with the crime. (6/2/93 Tr. T. at 885; 8/20/93 Hr. Tr. at 12, 37; 1/13/99 Hr. Tr. at 77, 89, 135, 183.) And, Mickens insisted on testifying to that effect at his trial and at sentencing. (1/13/99 Hr. Tr. at 69, 224.) Hence, Saunders was compelled to construct a defense that distanced Mickens from Hall and the murder scene. *Id.* at 77–78, 84. Saunders discarded consent as a strategy not because of any loyalty to Hall, but because neither the facts nor Mickens' testimony was compatible with such a strategy.[18] *Id.* at 68, 156–57, 231. An adverse effect cannot be found where a lawyer relies on what his client has told him and that reliance forecloses a line of defense. *See Royal v. Taylor,* 188 F.3d 239, 248–49 (4th Cir.1999) (citing *Barnes v. Thompson,* 58 F.3d 971, 979 (4th Cir. 1995)); *Parker v. Parratt,* 662 F.2d 479, 484 (8th Cir.1981) (concluding defense counsel could not be blamed for offering the defense sworn to by both defendants).

### 2. Failure to Ascertain and Use Information About Hall

Mickens asserts that an adverse effect of Saunders' conflict is manifest in his failure to investigate and to use negative information about Hall. This alternative defense strategy is based on the premise that negative information about the victim of a crime can be, and often is, used to mitigate the severity of the act of murder.

---

17. Leah Bush, the medical examiner testified that,

> [d]efense wounds are to areas of the body in a person who sees the injury coming and raises a portion of the body in a protective manner.... Oftentimes, the backs of the arms of or hand or in a case of a sexual or rape-type of assault also present [sic] on the

legs if the victim were to raise up their knees to ward off a blow or attack.

(5/26/93 Tr. T. at 510.)

18. At the evidentiary hearing, Keeling explained that he never raised the issue of consent with Mickens because Mickens insisted that he was not involved in the crime. (1/13/99 Hr. Tr. at 68.)

Of course, adoption of that alternative strategy would have been inconsistent with Mickens' profession of innocence and his purported regret at Hall's passing. "I'll pray each and every day that [Hall] may rest in peace." (6/4/93 Hr. T. at 1090 (sentencing hearing)). Saunders carried that standard during his closing argument, emphasizing the sanctity of human life and expressing regret for Hall's death. (2/7/96 Hr. T. at 479–80; 1/13/99 Hr. T. at 157.) Saunders eschewed an attack on Hall, the young victim of a horrible crime, because it would have appeared disingenuous and would have diminished the value of Mickens' life in the eyes of the jury. (1/13/99 Hr. T. at 112, 156–58; 12/23/98 Dep. at 76, 77).

Mickens' papers do not outline the precise contours of this alternative strategy, but it appears to be based on the premise that investigation would have shown that Hall was a neer-do-well, male prostitute who had been charged with carrying a weapon and assaulting his own mother. However, the record offers no support for the existence of evidence which would have made that strategy either plausible or viable. Even diligent investigation by federal habeas counsel has uncovered nothing but rumor about Hall's supposed life as a male prostitute. But, even if that could have been proved, evidence on that point would be useful only by mounting a consent defense which was foreclosed by Mickens' insistance that he did not even know Hall or by pointing to another perpetrator, for which there was no admissible support either. The propensity of that approach to backfire made it an unreasonable alternate strategy or tactic at sentencing.

The evidence that Hall had been charged with carrying a weapon had no utility as an alternate strategy, even if it were admissible (which is highly doubtful). The evidence that Hall had been charged with assaulting his mother would have been useful insofar as it could be argued to discredit the mother's professions of grief tendered to the probation officer for inclu-

sion in the victim impact statement. Of course, that approach was fought with the risk of unintended consequences as well. In any event, even though admissible for impeachment, evidence on that point cannot be considered to present a plausible or viable alternate strategy because the assault was of a relatively minor nature and its impeaching effect would be de minimus.

Even if the negative information about Hall could be considered as raising a plausible, viable strategy, the record here dispels the contention that the failure to use negative information about Hall is attributable to any conflict of interest on the part of Saunders. This is particularly evident in the conduct of Saunders' co-counsel, Warren Keeling, who was in charge of the sentencing phase of Mickens' trial. (1/13/99 Hr. T. at 78.) In preparation for the trial, Keeling read the newspaper article, (Pet.Ex. 1, attached to initial federal petition), which reported that Hall had been charged with assaulting his mother; that the police had "picked him up" for carrying a weapon; that Hall had been kicked out of his mother's house; and that a social worker was involved in Hall's life. (1/13/99 Hr. T. at 61.) At the time, Keeling was looking for evidence about Hall that could be used at Mickens' sentencing. *Id.* at 57. Keeling did not deem any of the information reported in the newspaper article to be relevant to that end because he did not pursue it. *See Freund v. Butterworth,* 165 F.3d 839, 868 (11th Cir.) (en banc) (noting counsel's representation was not tainted by conflict, since conflict-free counsel would have chosen the same defense), *cert. denied,* —— U.S. ——, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999). Here, Keeling, who is free of conflict, followed the same course as that taken by Saunders.

### 3. Plea Negotiations

Another plausible alternative strategy would be a plea of guilty with a sentence other than death. And, that certainly would have been a reasonable alternative

under the facts. However, the absence of plea negotiations was attributable to the decision of the Commonwealth's Attorney who advised that there was "[n]o way" he would allow a plea in the case. (1/13/99 Tr. T. at 158; 12/23/98 Dep. at 80–81.) There is nothing in the record to suggest that the plea negotiations were not pursued because Saunders previously had represented Hall. Of course, it is possible that evidence of a consensual encounter or adverse information about Hall might have prompted a willingness to negotiate, but, as explained above, the record discloses that strategies based on those concepts were neither plausible nor viable.

### 4. Failure to Apprise the Sentencing Court of Hall's Pending Charges and Hall's Strained Relationship With His Mother

After the second jury had fixed Mickens' sentence at death, but before the formal imposition of the sentence of death, a post-sentence report was prepared for the judge who ultimately sentenced Mickens to death. *See* Va.Code Ann 19.264.5 (Michie 1990). That report contained the following information:

> The victim's mother stated as a result of this offense, her marriage broke up. She stated also the offense shattered her world. She stated "all I lived for was that boy." As a result of the offense, the victim's mother stated she dropped out of school, she lost the potential of a good income, that her daughter became depressed for six months, and her husband went into the hospital for six months one month after Timothy died. She (mother) was left to deal with both her daughter's depression and her husband's illness.

> The victim's mother stated "I'll never be over the way my son was killed."

(Circuit Court for the City of Newport News, Clerk's Record, Post-sentence Report prepared 3/6/96.)

Mickens argues that Saunders could have used information gleaned from his representation of Hall to rebut the mother's statements that she was overwrought at the death of her son, but that his previous representation of Hall kept that attack on Hall's mother out of the sentencing proceeding. Mickens has not established that, in the context of the sentencing hearing required by Va.Code Ann. § 19.2–264.5 hearing, a tactic of that sort "possessed sufficient substance to be a viable alternative." *Freund v. Butterworth,* 165 F.3d 839, 860 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999).

Under Va.Code Ann. § 19.2–264.5, when a jury has fixed a defendant's punishment at death, the trial court, before imposing sentence, must require a thorough investigation by a probation officer into the defendant's history and background so that the court "may be fully advised as to whether the sentence of death is appropriate and just." After considering the report, the court, "upon good cause shown," may set aside the death sentence and impose a sentence of life imprisonment. *Id.* The Supreme Court of Virginia has emphasized that, in recommending death, "the jury's verdict is not merely a recommendation to be followed or rejected by the trial court at its discretion." *Frye v. Commonwealth* 231 Va. 370, 345 S.E.2d 267, 286 (1986). Although the Supreme Court of Virginia has not posited a concise definition of what constitutes "good cause" in the capital sentencing context, the Court's consistent refusal to find good cause attests to the exacting nature of the standard. *See Hedrick v. Commonwealth,* 257 Va. 328, 513 S.E.2d 634, 641 (1999); *Roach v. Commonwealth,* 251 Va. 324, 468 S.E.2d 98, 113 (1996); *Chandler v. Commonwealth,* 249 Va. 270, 455 S.E.2d 219, 226–27 (1995); *Watkins v. Commonwealth,* 229 Va. 469, 331 S.E.2d 422, 438 (1985); *Bunch v. Commonwealth,* 225 Va. 423, 304 S.E.2d 271, 285 (1983).

Considering the difficulty of showing good cause under Virginia law and consid-

ering that Mickens has failed to show how impeaching Hall's mother's assertions of grief would have furthered a finding of good cause, it cannot be said that the tactic, if employed, would have met the test of viability. And, in any event, the tactic was inconsistent with Mickens' expressions of regret for the pain that Hall's death caused his mother. (3/29/96 Hr. T. at 22).

Thus, Mickens has failed to show that the purported conflict resulted in Saunders foregoing a plausible alternate strategy or tactic that was reasonable under the facts. And, perhaps more importantly, even if it is assumed that there was a plausible, viable alternate strategy that Saunders failed to pursue, the record shows no link between the failure to pursue it and the asserted conflict.

### F. Adverse Effect: General

Wholly apart from the question of alternate strategies foresworn, Mickens raises two other reasons why the conflict adversely affected Saunders' representation. First, Mickens contends that Saunders' investigation was deficient. Second, Mickens argues that the failure of Saunders to pass along information to his co-counsel, Warren Keeling, was per se an adverse effect. Those contentions will be considered next.

### 1. Deficient Investigation

Mickens asserts that, but for the conflict, Saunders would have reviewed Hall's juvenile file and would have pursued leads provided to the police by Bernard Gordon, Alicia Thrash, and Charity Fleming. According to Mickens, had these basic tasks been performed, Saunders would have uncovered evidence useful for his defense.

Saunders testified that he never considered reviewing Hall's juvenile file because he believed that file did not contain any information pertinent to Mickens' case. That, of course, misses the point because a reasonable investigation would have included an examination of Hall's past, including his JDR Court file (assuming that could had been accomplished under state law). Moreover, without reviewing the file, Saunders' view on that topic is speculative. But, the Court's review of Hall's juvenile file confirms that, on that score, Saunders' guess was a correct one.

The explanation given by Saunders for not pursuing the information contained in the police files because to do so would have been a waste of time is not so readily dispatched. Saunders says that he reviewed the police files and took notes of their contents. Those notes reflect that Bernard Gordon (the father of the family with whom Hall lived at the time of his death) told the police that "nothing much else of use—except that Tim [Hall] had been ducking three guys [he] owed money to for about three months. They came to the apartment at least once." (Pet.'s Ex. 2B at 1/13/99 Hr. T. at 127.) Those notes, of course, present the prospect that Hall's creditors might have killed him. Saunders testified that he intended to talk to Gordon, but that Gordon died before Saunders was able to interview him. (1/13/99 Hr. T. at 128.) Although Gordon might have provided information suggestive of another perpetrator, the failure to secure his knowledge before he died was not attributable to a conflict. That, however, does not explain why Saunders did not pursue the same lead from other sources. The lead should have been pursued because, given Mickens' position that he did not know Hall, the lead suggested that there might have been evidence of an alternate perpetrator. The record discloses no reason for the failure to follow that lead other than Saunders' lack of perspicacity or perhaps indolence. Neither of those reasons bespeaks that he failed to act because of his previous representation of Hall.

Next, Mickens faults Saunders for failing to pursue information which Alicia Thrash and Charity Fleming provided to the police which, according to Mickens, suggested that Hall was being harassed by

a male prostitute on the night of the murder. (P.'s Resp. to Feb. 2, 1999 Order at 29.) Evidence of that sort also might have allowed counsel to argue the existence of another perpetrator. Alicia Thrash was Hall's friend and Hall intended to attend Thrash's sixteenth birthday party on the night that he was murdered (Saturday, March 28, 1992). After Hall was murdered, Thrash spoke to "Stephanie," Hall's ex-girlfriend. Stephanie told Thrash that she had talked to Hall on the night of his death. Saunders' notes reflect that on April 10, 1992, Thrash provided the following statement to the police:

> Everything got real messed up cause when we went to the wake [for Hall], this girl named Stephanie said Timmy [Hall] had called her Saturday night, all scared and nervous, talking about this prostitute was harassing him, saying all kinds of stuff, that he was harassing him over something or other, & then she told him to come pick her up, and he said that he was at the end of 29th Street, that is where he said by the construction office, that's where he was at. & she said he called her & told her to come pick him up like that.

(Pet.'s Ex. 2A at 1/13/99 Hr. Tr. at 124–25.) That information, of course, presented the possibility that Hall was killed in a dispute with a male prostitute.

On the other hand, Saunders also had access to Charity Fleming's statement to the police which indicated that Thrash's secondhand account of the events was less than reliable. According to Saunders' notes, Fleming "supposedly talked to Tim [Hall] on Sunday around 6–7 and wanted her or Stephanie (Ex-girlfriend) to pick him up at 29th St either on [the] corner or at Basic [Construction] because of problems he was having with a *girl* he picked up on Washington Ave. [a] couple of days before. (this could be just Bull/ or she could have the day wrong)." (Pet.'s Ex. 2B 1/13/99 Hr. T. at 127–28) (emphasis added). Fleming's account of the conversation indicates that Hall's request for a ride came on Sunday (the day after Hall's death) and was prompted by trouble that Hall was having with a girl, not a male prostitute.

Both Thrash and Fleming offered leads which may have made it more difficult for the Commonwealth to prove that Mickens was the murderer because they pointed to an alternate killer. However, Saunders' rejected the Thrash/Fleming lead because he did not believe that the lead was credible (12/23/98 Dep. at 52–54) for the reason that Fleming said that she spoke to Hall on Sunday, the day after Hall was killed. At the same time, Saunders concluded that the Thrash/Fleming lead pointed to an angry female as the perpetrator (1/13/99 Hr. T. at 131–32), and, therefore, concluded, in light of the overtly homosexual nature of the crime, that none of the leads suggested by Gordon, Thrash or Fleming could identify a viable alternative perpetrator of the crime.[19] *Id.* Those reasons for refusing to pursue evidence which pointed to the existence of an alternative perpetrator are not defensible, especially where, as here, a client's life is on the line. Additionally, Fleming's assertion that Hall was still alive on Sunday was hardly inconsequential to Mickens' defense considering that the Commonwealth's Attorney conceded, at Mickens' preliminary hearing, that it was not "going to be able to determine the precise date that this homicide took place." (P.'s Ex. 5 from Federal Evidentiary Hearing, at 59.). Evidence of that sort could have helped to undermine the relevance of the testimony of Vincent West and Bruce Mitchell that Mickens was lurking around the area where Hall was murdered on Saturday night.

However, Mickens must do more than show that Saunders could, or should, have pursued a promising lead. He must also establish some link between the asserted actual conflict and the decision to forego

19. Saunders spoke to Thrash over the telephone, but did not question her regarding her statement about a prostitute harassing Hall. (1/13/99 Hr. T. at 242–43.)

further investigation of the lead. *See Freund v. Butterworth,* 165 F.3d 839, 860, 869 (11th Cir.) (en banc), *cert. denied,* —— U.S. ——, 120 S.Ct. 57, 145 L.Ed.2d 50 (1999); *Wilson v. Moore,* 178 F.3d 266, 281 (4th Cir.1999); *Stoia v. United States,* 109 F.3d 392, 397 (1997) (rejecting conflict claim where petitioner "failed to show the connection between any actual conflict of interest and any adverse effect on" petitioner's defense). In other words, Mickens has "the burden of proving through a preponderance of the evidence" that Saunders "would have" pursued the Thrash and Fleming leads "but for" Saunders' professional relationship with Hall. *Freund,* 165 F.3d at 869. Mickens may carry this burden by showing that pursuit of these leads "was inherently in conflict with" Saunders' "other loyalties or interests" or by other probative evidence that he did not pursue the leads because of those interests. *Id.* at 860. This, he has failed to do.

In sum, there is an absence of convincing evidence connecting the Thrash and Fleming leads with Saunders representation of Hall. There is no suggestion that Thrash, Fleming or Stephanie, Hall's ex-girlfriend, were involved, even tangentially, in the concealed weapons and assault charges as to which Saunders served as counsel to Hall. Nor has Mickens produced any plausible evidence that, *during his representation of Hall,* Saunders suspected that Hall was involved in prostitution.

When all is said, the Court credits Saunders' testimony that he did not refrain from taking any actions for Mickens because of his earlier representation of Hall. (1/13/99 Hr. T. at 219, 240–41); *Freund,* 165 F.3d at 869. And, Mickens has failed to show that pursuit of the Thrash and Fleming leads was inherently in conflict with, or was not undertaken because of,

Saunders' loyalty to Hall or because of Saunders' own interests.

### 2. Saunders' Failure to Advise Keeling of Information About Hall

While it certainly is reasonable (and expected) that counsel would share with co-counsel that he previously had represented the victim, it is undisputed that Saunders never told Keeling about his previous representation of Hall.[20] Mickens asserts that Saunders failed to share the fact of his representation of Hall and whatever information that he had about Hall because Saunders feared that his conflict would be discovered and that he would be removed as Mickens' counsel in the capital case, thereby forfeiting the prestige and financial benefits which are associated with serving as counsel in this case.

Virginia's scheme for compensating lawyers in capital cases, parsimonious as it is, does not support a finding that Saunders was motivated by financial gain. And, although some publicity, and hence some prospect of luring clients, often attends representation of a client in a notorious case, the record does not disclose that Mickens' case was of that ilk, notwithstanding that, like most murders, substantial publicity surrounded it.

After viewing Saunders' testimony, the Court is unconvinced that such selfish "loyalties or interests" existed, much less motivated Saunders' silence. (1/13/99 Hr. T. at 93, 102–4). Rather, this lapse of communication is attributable to Saunders' myopic view of the potential conflicts and utter insensitivity to the ethical issues raised by the facts. (*Id.* at 95, 108–11, 220, 227–28.) Saunders did not believe the Hall representation was a source of relevant information or potential conflicts for the Mickens case. Thus, as far as he was

---

**20.** *According to Saunders, he assumed that Keeling (and everyone else) knew that he had represented Hall. (1/13/99 Hr. T. at 105.) That assertion lacks evidentiary support and, considering the secrecy attached to juvenile proceedings and a lawyer's obligations of con-* fidentiality, the explanation borders on the absurd. Indeed, Saunders could not recall mentioning to anyone, at the time he represented Mickens, that he had previously represented Hall. *Id.* at 107.

concerned, his perception ended the matter for all concerned: his client, the court and co-counsel. The record does not demonstrate that Saunders' silence, *albeit* inexcusable, was attributable to Saunders' self-interest. *See Williams v. French*, 146 F.3d 203, 212–13 (4th Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1061, 143 L.Ed.2d 66 (1999).

## VII. FAILURE OF THE COURT TO CONDUCT AN INQUIRY INTO THE PURPORTED CONFLICT

As a separate, but related ground of relief, Mickens contends, relying on *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981), that he is entitled to a new trial because JDR Court Judge Foster removed Hall's criminal case from the docket, and shortly thereafter, without conducting any inquiry, appointed Saunders to represent Mickens on the charges arising out of Hall's murder. In *Wood*, the Supreme Court *sua sponte* raised an attorney conflict of interest claim. The Court concluded that "the **possibility** of conflict was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further." *Id.* at 272, 101 S.Ct. 1097 (emphasis added). However, the Court could not be sure whether counsel was adversely affected by a conflict. Consequently, the Court remanded the case for a hearing to determine whether an actual conflict existed and, if so, whether the right to independent counsel had been waived. *Id.* at 273–74, 101 S.Ct. 1097.

Mickens cites a footnote in *Wood* for the proposition that the absence of any inquiry by Judge Foster requires the reversal of his conviction. That footnote reads:

> Justice White's dissent states that we have gone beyond the recent decision in Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Yet nothing in that case rules out the raising of a conflict-of-interest problem that is apparent in the record. Moreover, Sullivan mandates a reversal when the trial

> court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.' *Id.* at 347, 100 S.Ct. 1708

*Wood*, 450 U.S. at 272 n. 18, 101 S.Ct. 1097 (emphasis in original).

The Commonwealth responds that the JDR Court did not try Mickens and thus is not the "trial court" charged with a duty to inquire under *Wood.* That argument, however, is not grounded on authority which supports the proposition that only the court that actually tries the defendant is charged with making such an inquiry. Rather, precedent and common sense dictate that the duty to inquire into apparent conflicts arises before the case winds its way to the particular court and judge tasked with conducting the defendant's trial. *See Holloway v. Arkansas*, 435 U.S. 475, 489–90, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978) (emphasizing the importance of conflict free counsel in pretrial proceedings, including plea negotiations); *Wilson v. Morris*, 527 F.Supp. 422 (C.D.Ill. 1981) (concluding that the preliminary examination judge is charged with making inquiry when apprised of particular conflict) *rev'd on other grounds*, 724 F.2d 591 (7th Cir.1984) (en banc) (however that court's duty to perceive the conflict is qualified by its limited role); *Cf. Carter v. Commonwealth*, 11 Va.App. 569, 400 S.E.2d 540, 543 (1991) (reversing conviction for court's failure to initiate *Wood* inquiry when probable risk of conflict was brought to its attention during pre-trial proceedings). Thus, the duty to inquire into particular conflicts extends to the JDR Court in this instance because it appointed Mickens' counsel.

Moreover, the record before Judge Foster presented special circumstances of an apparent possible conflict which required judicial inquiry. On Friday, April 3, 1992, Judge Foster removed the assault and concealed weapons charges against Hall from the docket, noting that the defendant was deceased. (*Commonwealth v. Hall*, No. J.40845–2, 3, (Newport News JDR

Court Apr. 3, 1992.)) Judge Foster's handwritten order dismissing the charges was entered directly upon the individual docket for Hall's juvenile charges. That docket entry consisted of a single page which set forth Hall's full name, date of birth, an abbreviated history of the proceedings, the charges, and the identity of his appointed attorney, Bryan Saunders. *Id.* Judge Foster entered the order removing Hall's case from the docket before the case was called. (1/13/99 Hr. T. at 96–97.) And, Saunders testified that he learned from some unidentified person (either in the courthouse or in the courtroom) that the charges against Hall had been dismissed because Hall was dead. *Id.* at 96–97, 218. There was no evidence that Saunders appeared before Judge Foster on the date that the charges against Hall were dismissed, Friday, April 3, 1992.

■ However, on Monday, April 6, 1992, the next business day, Judge Foster appointed Saunders to represent Mickens in the capital murder of Hall. (Newport News Circuit Court Record at 5.) Mickens' arrest warrants, which appear to have been before Judge Foster when she appointed Saunders, charged that "on or about March 30, 1992" Mickens murdered "Timothy Jason Hall, white male, age 17, by stabbing, and during the commission of an abduction, and sodomy as well as robbery". *Id.* at 4. At that time, Judge Foster knew, or should have know, that Saunders was being appointed to represent Mickens on charges of murdering the juvenile Saunders recently represented.

Certainly, on Monday, April 6, 1992, Judge Foster connected, or had the capacity to connect, the juvenile, capital murder victim, Timothy Jason Hall with the de-

ceased juvenile defendant whose case she had removed from her docket the previous Friday. The heinous nature of the crime and the publicity it received make it difficult to accept that the connection would have escaped Judge Foster's notice. (1/13/99 Hr. T. at 36.) In selecting counsel for Mickens, the judge was no doubt aware that Mickens faced charges as to which it might be necessary to counter "evidence about the victim and about the impact of the murder on the victim's family", at least at the penalty phase of the case. *See Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). In light of that prospect, Judge Foster should have recognized the potential conflict in appointing the attorney who represented the victim on criminal charges at the time of his death, to represent the capital defendant at sentencing. The failure to do so was error under *Wood.*[21]

However, just as in *Wood,* the failure to inquire into a possible conflict does not require reversal. *Wood v. Georgia,* 450 U.S. 261, 273–74, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). Properly understood, the trial court's duty to inquire into known or obvious conflicts of interest "is a reflection of the fact that absent an inquiry, the record will demonstrate that a particular conflict existed in violation of the Sixth Amendment. Unless a judicial inquiry rebuts the conclusion otherwise compelled by the circumstances, relief must be granted." *Wilson v. Morris,* 724 F.2d 591, 594 (7th Cir.1984) (en banc). Thus, where, as here, further judicial inquiry reveals that potential conflict never ripened into an actual conflict, the petitioner is entitled to no relief. *See United States v. Young,* 644 F.2d 1008, 1013 (4th Cir.1981) (remanding for an inquiry into whether an actual con-

---

**21.** Then, on July 17, 1992, Judge Foster conducted the preliminary hearing on the charges against Mickens. (Newport News Circuit Court Clerk's Record at 2 and 4.) At that hearing, the Commonwealth presented twelve witnesses and more than one hundred pages of testimony in support of its case. (P.'s Ex. 5 from 1/13/99 Hr.) That evidence afforded Judge Foster with an overview of the known circumstances surrounding Hall's death. At the conclusion of the Commonwealth's evidence, Judge Foster found probable cause to certify a charge of attempted forcible sodomy and capital murder during the commission of attempted forcible sodomy to the grand jury. *Id.* at 130. Judge Foster found no probable cause on the charges of abduction with intent to defile and robbery.

flict existed in successive representation), *appeal after remand,* 677 F.2d 381, 383 (4th Cir.1982). *See also Garcia v. Bunnell,* 33 F.3d 1193, 1199 (9th Cir.1994); *Boysaw v. Deans,* No. 89–7794, 935 F.2d 267, 1991 WL 89923, at *5 n. 1 (4th Cir. May 31, 1991); *Sutton v. Murray,* No. 88–7192, 881 F.2d 1070, 1989 WL 87660 at *1 (4th Cir. Aug.1, 1989); *Wilson v. Morris,* 724 F.2d 591, 594 (7th Cir.1984) (en banc); *United States v. Winkle,* 722 F.2d 605, 611–612 (10th Cir.1983); *Brien v. United States,* 695 F.2d 10, 15 n. 10 (1st Cir.1982); *United States v. Green,* 680 F.2d 183, 191–92 n. 12 (D.C.Cir.1982); *Cox v. Norris,* 958 F.Supp. 411, 418 (E.D.Ark.1996); *Bonin v. Vasquez,* 807 F.Supp. 589, 606 (C.D.Cal. 1992); *In Re Richardson,* 100 Wash.2d 669, 675 P.2d 209, 215 (1983). *But see Ciak v. United States,* 59 F.3d 296, 302 (2d Cir.1995) (applying automatic reversal rule).

Judge Foster was not relieved of her duty to inquire into the apparent possible conflict presented here simply because Mickens' trial was to be conducted in another court or because some of her chargeable knowledge stemmed from a separate criminal matter. However, the "mere possibility of a conflict is insufficient to impugn a criminal conviction." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). As explained elsewhere in the opinion, the possible conflict of interest presented by Saunders' successive representation of Hall and Mickens never ripened into an actual conflict nor was Saunders' advocacy impaired thereby. Thus, Mickens has not shown that the shortcomings of court and counsel alleged in Claims 5 and 6 "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982) (describing standard for establishing prejudice sufficient to excuse a procedural default). For the foregoing reasons, Claims 5 and 6 will be dismissed.

## VIII. CONCLUSION

As Mickens so vigorously contends, Saunders conducted himself unwisely, and in derogation of his ethical duties, in successively representing Hall and his murderer without ever bringing such representation to the attention of the court or Mickens. And, the Newport News JDR Court was on notice of sufficient facts about the relationship between Hall and Saunders that it should not have appointed Saunders to represent Mickens without a full inquiry and without apprising Mickens of the potential conflict. However, that representation did not violate Mickens' constitutional rights.

Claims 1, 2 and 4 are dismissed on the merits. Claims 3 and 5 through 12 are procedurally defaulted. Mickens has not attempted to excuse his default of Claim 3, accordingly that Claim is dismissed. With respect to Claims 5 and 6, Mickens has demonstrated cause, but not prejudice, thus, Claims 5 and 6 will be dismissed. Finally, Mickens has failed to show cause, or a fundamental miscarriage of justice to excuse his default of his remaining claims, thus Claims 7 through 12 are dismissed. The petition for a writ of habeas corpus is denied. The action is dismissed.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

## ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. Claims 1, 2 and 4 are dismissed on the merits.

2. Claims 3 and 5 through 12 are procedurally defaulted and dismissed.

3. The petition for a writ of habeas corpus is denied.

4. The action is dismissed.

Mickens may appeal the decision of the Court. Should Mickens wish to do so,

written notice of appeal must be filed with the Clerk of the Court within thirty (30) days of the date of entry hereof. Failure to file a timely notice of appeal may result in the loss of the right to appeal.

It is so ORDERED.